**UNITED STATES of America**

v.

**Joseph P. RYAN, Defendant.**

United States District Court,
S. D. New York.

Jan. 24, 1955.

J. Edward Lumbard, U. S. Atty., for Southern Dist. of N. Y., New York City,

for United States. Arnold Bauman, George H. Bailey, New York City, and Dennis C. Mahoney, Asst. U. S. Atty., New York City, of counsel.

Waldman & Waldman, Attys. New York City, for defendant. Louis Waldman, Seymour M. Waldman and Martin Markson, New York City, of counsel.

PALMIERI, District Judge.

The defendant, Joseph P. Ryan, was indicted on three counts for alleged violation of section 302(b) of the Labor Management Relations Act of 1947, 29 U.S.C. § 186(b), 29 U.S.C.A. § 186(b). The indictment charged that on three separate occasions the defendant while a representative of employees who were employed in an industry affecting commerce, unlawfully, wilfully and knowingly received and accepted sums of money from the employers of such employees.

The case was tried before me without a jury, and I find that the evidence established the following facts beyond a reasonable doubt. In 1950 and 1951, the years covered by the indictment, the defendant was president of the International Longshoremen's Association (ILA) and the Atlantic Coast District of the ILA. The ILA, the Atlantic Coast District of the ILA, and the ILA's affiliated local unions were the recognized collective bargaining agents for longshore labor in the Port of New York. These organizations bargained for longshore labor in the Port of New York through the Wage Scale Committee of the ILA and were parties to collective bargaining agreements which governed the terms and conditions of employment of longshore labor in the Port. Defendant was a member of the Wage Scale Committee and was authorized to sign and did sign the agreements in effect in 1950 and 1951.

The Wage Scale Committee of the ILA bargained with the New York Shipping Association (NYSA), an association of employers of longshore labor, and J. Arthur Kennedy & Son, Inc., was a member of the NYSA in 1950 and Daniels & Kennedy, Inc. was a member of the NYSA in 1951. Both of these concerns were engaged in stevedoring affecting commerce [1] and their employees were members of local unions affiliated with the ILA and were employed in an industry affecting commerce. The collective bargaining agreements entered into by the ILA and the NYSA were binding on J. Arthur Kennedy & Son, Inc. (Kennedy & Son) and on Daniels and Kennedy, Inc. by reason of their membership in the NYSA.

In December of each year from 1946 to 1951, James C. Kennedy, president of Kennedy & Son and of Daniels & Kennedy, Inc., gave the defendant $1,000; and in April, 1951 James C. Kennedy gave the defendant $500. On each of these occasions James C. Kennedy visited the defendant in his office at 14th Street and Eighth Avenue in New York City and gave him the money. In December, 1950 the envelope containing the money had the following message written on it: "Merry Christmas to Joseph P. Ryan from J. Arthur Kennedy & Son, Inc." In December, 1951 the message on the envelope read: "Merry Christmas to Joseph P. Ryan from Daniels & Kennedy." In April, 1951 the envelope containing the money had no message written on it.

The law which defendant has allegedly violated provides that

"It shall be unlawful for any representative of any employees who are employed in an industry affecting commerce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value." 29 U.S.C. § 186(b), 29 U.S.C.A. § 186(b).

---

[1]. "Affecting commerce" is defined in section 101 of the Labor Management Relations Act, 1947, 29 U.S.C. § 152(7), 29 U.S.C.A. § 152(7).

And it further provides that

"Any person who willfully violates any of the provisions of this section shall * * * be guilty of a misdemeanor * * *." 29 U.S.C. § 186 (d), 29 U.S.C.A. § 186(d).

The defendant did not offer any evidence to controvert the proof that he had received and accepted money from James C. Kennedy.

Since "employer" is defined as including "any person acting as an agent of an employer, directly or indirectly," Labor Management Relations Act, 1947, §§ 501 (3), 101(2), 29 U.S.C. §§ 142(3), 152(2), 29 U.S.C.A. §§ 142(3), 152(2), and James C. Kennedy was acting as an agent of Kennedy & Son and Daniels & Kennedy, Inc. when he gave the defendant money in 1950 and 1951, it is clear that the defendant received and accepted money from "the employer" of employees who were employed in an industry affecting commerce. But the defendant contends (1) that he cannot be considered to have violated 29 U.S.C. § 186(b), 29 U.S.C.A. § 186(b), because he was not a "representative of * * * employees" within the meaning of the section, and (2) that even if it should be decided that he was a "representative of * * * employees", the Government has not proved a wilful violation of section 186(b) and has therefore failed to prove that he committed a crime. 29 U.S.C. § 186(d), 29 U.S.C.A. § 186(d).

Defendant's contention that he was not a "representative of * * * employees" within the meaning of section 186(b) is based on his belief that the phrase "representative of employees" as used throughout the Labor Management Relations Act of 1947 is a term of art for the collective bargaining agent for a group of employees. The defendant argues that neither he nor any other individual was the "representative" of the longshoremen who were members of the ILA, the Atlantic Coast District of the ILA, and the local unions affiliated with the ILA. In each case, he says, the union was the "representative of * * * employees."

According to the defendant, section 186 was enacted to insure that welfare funds would be administered for the benefit of union members and would not be used to further the purposes of the union or the union officers; and to limit check-off payments to labor organizations. The defendant argues that Congress intended to achieve these purposes, and did not intend to prohibit gifts to union officers from the employers of the men they represented.

The legislative history of section 186 does not sustain defendant's position. The provision that later became section 302(b) of the Labor Management Relations Act, 1947, 29 U.S.C. § 186(b), 29 U.S.C.A. § 186(b), was offered as an amendment to the bill by Senator Ball in behalf of himself, Senator Byrd and other Senators. See 93 Cong.Rec. 4677 (1947). A similar provision had been offered as an amendment to a bill by Senator Byrd in the preceding Congress. See 92 Cong.Rec. 4809 (1946). It had been passed but was vetoed by President Truman. So far as is material to the decision of the instant case, the Byrd amendment and the Ball amendment are similar to section 186.

Throughout the debate on the Ball amendment Senators evidenced an awareness that section 186 would apply to payments to a union official by an employer of men whom the official represented. For example, while explaining the effect of section 186 on the floor of the Senate, Senator Taft said,

"The amendment provides first that—

"It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees.

"That is, it may be said, in a case of extortion or a case where the union representative is shaking down

the employer * * *." 93 Cong. Rec. 4746 (1947).

And Senator Pepper said,

"* * * I simply wish to state that I wonder whether it can be correctly assumed that the application of this provision is to be limited to representatives of unions. Could it not be regarded as affecting contributions made to representatives of unorganized groups, and affecting, for instance contributions provided by management for picnics or in aid of baseball teams which the employees often have, and other contributions of that character. Would not all such contributions be forbidden under the terms of this provision?"

Senator Ives replied, "Presumably that is correct * * *." 93 Cong.Rec. 4748 (1947).

Similarly, the legislative history of the Byrd amendment shows that Congress intended section 186 to apply to payments to a union official as well as to a labor organization. Thus, in explaining the amendment Senator Byrd said,

"In general the amendment prohibits payments by an employer of money or other things of value to *labor representatives and labor organizations,* but in no manner does

it prohibit the payment of such things to employees directly * *." 92 Cong.Rec. 4891 (1946),

and

"My amendment would prevent an employer from paying a royalty to the *representative of a union.* He would be clearly liable, under the provisions of this amendment, if he paid a royalty or other money to the *representative of a labor union,* the purpose of which was to bribe that representative * * *." 92 Cong. Rec. 4893 (1946).[2]

The defendant argues that this legislative history is irrelevant because the conference committee changed section 186 and Congress enacted the provision as changed by the committee and not the provision which had been discussed on the floor of the Senate. The conference committee deleted from section 186 a definition of the word "representative" which was to have applied to that section, and included "representative" among the terms which were defined for the purposes of the Labor Management Relations Act, 1947, Cf. Legislative History of the Labor Management Relations Act, 1947, pp. 26, 29, 283, 290 (1948). From these changes the defendant infers that Congress intended "representative of * * * employees" to mean only the

---

2. See also a debate between Senator Byrd and Senator Pepper on the scope of the amendment.

"Mr. Byrd. The amendment is very clear. It prevents only the payment to a representative of employees * * *."

"Mr. Pepper. Mr. President, is it not patent on the face of the statement, in the first place, if John L. Lewis says * * * 'We will not go back into the mines unless you provide a health fund, even jointly administered,' that that is a thing of value? Is not that something demanded under paragraph (b) of the amendment, by a representative of a labor union?

" 'It shall be unlawful for any representatives of any employees.' *Does anyone doubt that John L. Lewis is representing the employees?*

* * * * *

" 'To demand, receive, or accept, or agree to receive or accept, from the em-

ployer of such employees any money or other thing of value.' Does anyone deny that John L. Lewis in making demand even for a health fund that will be jointly administered, is demanding something that will be of value to the employees?

* * * * *

"Mr. Byrd. I am offering the amendment to prevent the payment of a royalty to the *representatives of a union.*

* * * * *

"Mr. Byrd. There is only one justification for the Senator's suggestion, in line 8, there I used the word 'demand', which is linked with the word 'receive' and 'accept' which follow it, and if the Senator objects to that, I am perfectly willing to strike it out." 92 Cong.Rec. 4900 (1946) and see 92 Cong.Rec. pp. 4895–4897, 5040–5041 (Senator Byrd), 5180–5181 (Senator Overton), 5428 (Senators Hatch and Tunnell), 5429 (Senators Hatch and Hoey) (1946).

collective bargaining agent for a group of employees.

 The defendant's inference is a farfetched one. The report of the conferees on the part of the House of Representatives discusses section 186 under the heading "Restrictions on Payments to Employee Representatives." It states,

> "Section 302 of the Senate amendment contained a provision making it unlawful for any employer to pay any money or thing of value to any representative of his employees employed in an industry affecting commerce, or for any such representative to accept from the employer any money or other thing of value, with certain specified exceptions.
>
> \* \* \* \* \* \*
>
> "The conference agreement adopts the provisions of the Senate amendment with minor clarifying changes." H.R.Rept. No. 510, Conference Report, 80th Cong., 1st Sess. 66–67 (1947).

In the light of this language I cannot agree with the defendant's contention. For if the conferees intended to give "representative of \* \* \* employees" the limited meaning which the defendant ascribes to it, they would not have said that they adopted the "provisions of the Senate amendment with minor clarifying changes." I therefore conclude that the defendant was a "representative of \* \* \* employees" within the meaning of section 186(b).

The defendant also contends that even if he were a "representative of \* \* \* employees" he is not guilty of a crime because the Government must prove that he "wilfully" violated section 186(b) and it has failed to do so. See Labor Management Relations Act, 1947, § 302(d), 29 U.S.C. § 186(d), 29 U.S.C.A. § 186(d).

 In my opinion a wilful violation of section 186(b) is proved if it is shown that a "representative of any employees who are employed in an industry affecting commerce" received or accepted money from the employer of such employees with knowledge (1) that he was receiving or accepting money, and (2) that the person who was giving him the money was an employer of employees that he represented. It seems clear that the defendant knew that he was receiving money in December, 1950 and in April and December, 1951. Since 1946 he had received money from James C. Kennedy under similar circumstances. The envelopes given to him in December, 1950 and December, 1951 had $1,000 written lightly in pencil in the upper righthand corner. In November 1952, Ruth M. Kennedy, an officer of the employer companies, who had planned and prepared for the payments to the defendant, testified under subpoena before the New York State Crime Commission, sitting in executive session. One week later the defendant appeared at her office. He was seeking James C. Kennedy, the disburser of the payments. According to her testimony, which I believe trustworthy, the following took place:

> "Q. What was your conversation with Mr. Ryan, please?
>
> "A. He came in and told me that he was looking for my nephew, James C. Kennedy, and I said as a matter of fact I was looking for him myself, and he went on to say that he wanted to know from—what had been reported by us to the State Crime Commission.
>
> "I told Mr. Ryan that I couldn't tell him anything about what had taken place at the Crime Commission because we had been, as I believe it, sworn under oath of secrecy, and he then said to me it was income tax in one way and perjury the other, and I said 'Well, why don't you just tell the truth? It is rather a serious business'—and that was it. I said I was sorry I couldn't help him and he said, 'Good-by' and left the office."

The evidence relating to the 1950 and 1951 transactions was sufficient to justify the conclusion that the defendant had knowingly received and accepted the moneys specified in the indictment.

I also believe that the evidence proves that the defendant knew that the person who was giving him money was an employer of employees that the defendant represented. It was proved that the defendant was in 1950 and 1951, and for many years prior to those had been, president of the ILA and of the Atlantic Coast District of the ILA. It was also proved that Kennedy & Son and Daniels & Kennedy, Inc. were members of the NYSA who employed longshore labor and were bound by contracts entered into by the ILA and the NYSA. Furthermore, it was established that the envelopes containing the money that James C. Kennedy handed to the defendant from 1946 to 1951 (except that of April, 1951) bore the name of Kennedy & Son or Daniels & Kennedy, Inc.; and that after the defendant had discovered that James C. Kennedy had testified before the New York State Crime Commission in 1952 he came to the office of Daniels & Kennedy, Inc. and asked to see James C. Kennedy. When in addition to these facts, no personal relationship is shown which would lead the defendant to expect gifts from James C. Kennedy, Kennedy & Son, or Daniels & Kennedy, Inc., the inference that the defendant knew that he was receiving money because he was a union official who represented men employed by the person who was giving him the money is the only one that can reasonably be drawn. I therefore find that the defendant knew that the person who was giving him money was an employer of employees that he represented, and that the Government has proved a wilful violation of section 186(b).

The defendant objects to section 186 (b) on constitutional grounds. He urges that section 186(b) is repugnant to the due process clause of the Fifth Amendment for two reasons. First, the words "any representative of any employees" are so vague and indefinite that reasonable men cannot know whether they are within the class of persons who may not engage in the described activities. Second, section 186(b) is beyond the power

of Congress to enact because it is unreasonable to prohibit a person who is a union official from receiving money from a person who is an employer of the men whom the official represents just because one is a union official and the other is an employer of men whom the official represents.

The "void for vagueness" argument cannot be sustained. The defendant was not a sergeant-at-arms of a union; nor was he a president who did nothing more than preside at meetings, or an attorney who represented the union. He was an officer of the union with a high degree of discretion and responsibility who was actively concerned with the relations between his union and the companies from which he received the money. He was president of the ILA and the Atlantic Coast District of the ILA, and as a member of the Wage Scale Committee he represented the employees who were members of these and affiliated unions in the collective bargaining process. Under these circumstances it would be idle speculation for this Court to predict whether a sergeant-at-arms, a president who does nothing but preside at meetings, or an attorney of the union could be considered a "representative of * * * employees" under section 186 (b). If such questions are presented under section 186(b), the Court can then rule on them.

That there may be marginal cases presenting difficulties of factual demarcation is not sufficient ground for striking down a statute for ambiguity. United States v. Petrillo, 1947, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877; Robinson v. United States, 1945, 324 U.S. 282, 65 S.Ct. 666, 89 L.Ed. 944. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed. Jordan v. DeGeorge, 1951, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886. The Constitutional requirement of definiteness is fulfilled where the statute gives a person of ordinary intelligence

fair notice that his contemplated conduct is forbidden by its terms. United States v. Harriss, 1954, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989. And if the statute is plainly directed to a general class of cases, it will not be struck down as vague even though marginal cases pose questions of doubt. United States v. Harriss, supra, 347 U.S. at page 618, 74 S.Ct. at page 812.

Here the defendant was clearly a representative of the employees described in the statute. They were employed by an industry affecting commerce. There is no statutory magic to the term "representative." It is a word of common usage. I have already indicated why this term was of general import and not limited, as the defendant has argued, to the juridical entity recognized for collective bargaining purposes. And by adding the word "any" before "representative," the draftsman broadened the scope as far as could be, see Ex parte Collett, 1949, 337 U.S. 55, 58, 69 S.Ct. 944, 93 L.Ed. 1207, subject only to the specific exceptions defined by the statute itself in the following subsection, Section 186(c).

The defendant was one of the most important individuals representing these employees. He acted for and in behalf of the employees, whose employer was the disburser of the funds he received and accepted, in matters involving discretion and responsibility. He was clearly within the terms of section 186(b). Any reasonable person should have so understood.

 Defendant's argument that section 186(b) is beyond the power of Congress to enact because it is unreasonable is without merit. The Court does not have the power to decide whether an act of Congress is or is not reasonable and to strike it down if it believes that it is unreasonable. The Court can strike down an act of Congress only when it can say that there was no reasonable basis for the act. See United States v. Carolene Products Co., 1938, 304 U.S. 144, 152, 58 S.Ct. 778, 82 L.Ed. 1234.

I cannot make such a finding with respect to section 186(b). I cannot say that it was unreasonable for Congress to believe that the flow of commerce would be burdened or obstructed if the effectiveness of collective bargaining were impaired; and that its effectiveness would be seriously impaired if representatives of employees received or accepted money or things of value from the employers of the workers whom they represented. Indeed, I believe that the right of employees to bargain collectively, recognized and protected by the Labor Management Relations Act, 1947, is safeguarded by section 186(b) because removal of the opportunity for personal profit between the employer and the employee representative tends to preserve the integrity of the collective bargaining process. As such it bears a reasonable relationship to the avoidance of industrial strife and is not violative of the due process clause of the Fifth Amendment. See National Labor Relations Board v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 41–43, 57 S.Ct. 615, 81 L.Ed. 893.

 Finally, the defendant attacks the validity of section 186(b) as beyond the power of Congress to enact under its power over interstate and foreign commerce. There is no justification for this argument.

The commerce power has been held sufficiently broad to warrant Congressional intervention in the field of labor management relations. National Labor Relations Board v. Jones & Laughlin Steel Corp., supra. Mr. Chief Justice Hughes put the matter succinctly in this case, 301 U.S. at pages 41–42, 57 S.Ct. at page 626:

"* * * When industries organize themselves on a national scale, making their relation to interstate commerce the dominant factor in their activities, how can it be maintained that their industrial labor relations constitute a forbidden field into which Congress may not enter when it is necessary to protect interstate commerce from the paralyz-

ing consequences of industrial war? We have often said that interstate commerce itself is a practical conception. It is equally true that interferences with that commerce must be appraised by a judgment that does not ignore actual experience."

The preamble to the very Act of Congress here involved makes manifest the legislative intent to regulate labor management relations in order to prevent obstructions to the "free flow of commerce." The "Findings and declarations of policy" set forth in section 101 of the Labor Management Relations Act, 1947, 29 U.S.C. § 141 et seq., 29 U.S.C.A. § 141 et seq., read as follows:

"Experience has further demonstrated that certain practices by some labor organizations, their officers, and members have the intent or the necessary effect of burdening or obstructing commerce by preventing the free flow of goods in such commerce through strikes and other forms of industrial unrest or through concerted activities which impair the interest of the public in the free flow of such commerce. The elimination of such practices is a necessary condition to the assurance of the rights herein guaranteed."

It has already been indicated that section 186(b) cannot be said to be an unreasonable means of achieving the ends of industrial peace and facilitating the free flow of commerce. It follows, therefore, that this provision is not open to attack on the ground that Congress was powerless to enact it in the exercise of its power over interstate and foreign commerce. Cf. American Communications Ass'n, C.I.O. v. Douds, 1950, 339 U.S. 382, 390–393, 70 S.Ct. 674, 94 L.Ed. 925.

The defendant is found guilty as charged under Counts 1, 2 and 3 of the indictment and is directed to surrender forthwith for the purpose of pre-sentence investigation. Sentence will be imposed on February 1, 1955, at 10:00 A.M.