**UNITED STATES of America, Plaintiff,**

v.

**Gerald P. CONNELLY; Local No. 548, Teamsters, Chauffeurs, Warehousemen and Helpers of America, American Federation of Labor, International Brotherhood of Teamsters; and Local No. 194, General Service Employees Union, Building Service Employees International Union, American Federation of Labor, Defendants.**

**Crim. A. No. 8622.**

United States District Court, D. Minnesota, Fourth Division.

Feb. 24, 1955.

Irving Nemerov, Minneapolis, Minn., for defendant Gerald P. Connelly, for the motion.

Thomas O. Kachelmacher, Minneapolis, Minn., (Charles Alan Wright, Minneapolis, Minn., of counsel), for remaining defendants, for the motion.

George E. McKinnon, U. S. Atty., St. Paul, Minn., for the United States, opposed.

NORDBYE, Chief Judge.

The defendants have set forth four separate branches of their motion. The first branch seeks to have expunged from the record two paragraphs of the report of the Grand Jury of September 17, 1954, which was made to the Court at the time the indictment herein was returned. It is not necessary for this Court, on this motion, to determine whether the Grand Jury exceeded its prerogatives in advising the judge in charge of that body, and in making public, the nature of the investigation which it was conducting and which allegedly necessitated a continuance of its existence. This report was made to Judge Bell. He was in charge of the Grand Jury, and if any part of the report should be expunged, the proper procedure to be followed would be to present such motion to him. The report is not germane to the proceeding which is now before this Court. Newspapers did give the report a great deal of publicity, but any harm which may have resulted from such publicity has already taken place. The mere expunging of the report at this date would not remove any adverse effect of that publicity. Rather, the result might be that further publicity would

flow from such ruling. In any event, if the Grand Jury has been guilty of any impropriety in making the statements which are objected to, any action thereon should be taken by the judge to whom the report was made.

The second branch of the motion is addressed to the dismissal of the indictment. It is contended that the indictment fails to state facts sufficient to constitute an offense against the United States. The objection is bottomed upon the grounds that the portion of the Taft-Hartley Act, to wit, Section 186(b), 29 U.S.C.A., upon which the indictment is predicated, is unconstitutional and that it is repugnant to the Fifth and Sixth Amendments of the Constitution of the United States. The pertinent portion of the statute reads:

> "(b) It shall be unlawful for any representative of any employees who are employed in an industry affecting commerce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value."

Then follow certain exceptions as to which the provisions of Subsection (b) are not applicable.

The indictment consists of three counts. Count I charges that defendant Connelly, a representative of employees who were employed in an industry affecting commerce, knowingly, wilfully and unlawfully received and accepted $300 from the employer of the employees so represented by him, and that the payment was not made within the provisions of certain exceptions noted in the Act. Count II, with averments similar to those set forth in Count I, alleges that Connelly and Local No. 194 received the sum of $1,281.25 from certain employers of employees represented by the defendants. Count III, with averments similar to those set forth in Count I, alleges that Connelly and Local No. 548 received the sum of $2,440 from certain employers of employees represented by the defendants.

Defendants' position is that Section 186(b), by its broad and sweeping language, is void for uncertainty. That is, the defendants urge that, in order to make out a case under this statute, the Government would be required only to prove acts which constitute a literal violation of the statute, although the transaction may have been a perfectly innocuous incident involving the payment of money or thing of value by an employer to a union representative of the employees of such employer. And in support of their position, defendants set forth certain hypothetical situations which may arise between a representative of a labor union and an employer which it is asserted are not commonly considered as reprehensible, but which might run afoul of the statute.

This statute is a part of extensive legislation which Congress enacted in the field of labor-management relations. Reference may be made to the declaration of policy contained in the Act, Section 141(b):

> "Industrial strife which interferes with the normal flow of commerce and with the full production of articles and commodities for commerce, can be avoided or substantially minimized if employers, employees, and labor organizations each recognize under law one another's legitimate rights in their relations with each other, and above all recognize under law that neither party has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety, or interest.

> "It is the purpose and policy of this chapter, in order to promote the full flow of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose ac-

tivities affect commerce, to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce."

Defendants urge, however, that Section 186(b) was enacted primarily for the purpose of insuring that welfare funds would be administered for the benefit of members of the Union and would not be used to further the purposes of the Union or its officers. It is defendants' position, therefore, that Congress intended to achieve these purposes and only incidentally intended to prevent any extortion from any employer by union representatives or the bribing by the employer of employee representation. And it is contended by defendants that Congress did not intend to prohibit the acceptance of money or things of value by union officers from the employers of men they represent, and if that was the intent of Congress, the language which was used was too broad and sweeping in that it not only bans acts that may be considered reprehensible but also bans acts which never have been considered wrong by the public. That Congress, however, was aware of the existence of the evils which arise in labor-management relations by the payments of money by an employer of labor to a representative of the employer's employees is evident from the legislative history of the Taft-Hartley Act. The scope of the action which should be taken to curb such evils is for the legislative bodies and not for the courts to attempt to circumscribe. As Justice Frankfurter observed in his concurring opinion in American Communications Ass'n, C.I.O. v. Douds, 1950, 339 U.S. 382, 419, 70 S.Ct. 674, 694, 94 L.Ed. 925:

"Legislation, in order to effectuate its purposes, may deal with relations beyond the immediate incidence of a mischief. If a particular mischief is within the scope of congressional power, wide discretion must be allowed to Congress for dealing with it effectively. It is not the business of this Court to restrict Congress too narrowly in defining the extent or the nature of remedies. How to curb an evil, what remedies will be effective, the reach of a particular evil and therefore the appropriate scope of a remedy against it—all these are in the main matters of legislative policy not open to judicial condemnation."

However, in the same concurring opinion, there appears the following, 339 U.S. at page 419, 70 S.Ct. at page 694, which these defendants emphasize:

"* * * In order to curb a mischief Congress cannot be so indefinite in its requirements that effort to meet them raises hazards unfair to those who seek obedience or involves surrender of freedoms which exceeds what may fairly be exacted."

But obedience to this legislation does not involve the surrender of any freedom of action which Congress cannot control under its police power in this field. The language of Section 186(b), though broad and sweeping, is plain and unambiguous. Any reasonable person is warned that if he is a representative of any employees who are employed in an industry affecting commerce, he cannot receive or accept any money or thing of value from the employer of such employees unless the transaction falls within the exceptions noted in the Act. The payment of money by an employer to a union representative of the employer's employees, which is not within the exceptions noted in the Act, if not made for direct purposes which are inimical to the employer-employee relationship and public welfare, may be potentially fraught with such hazards. Euphemistically they may be characterized as Christmas presents or mere good-will gestures which are intended to enhance the friendly relations between the parties. But if Congress deems that to curb adequately the evils of extortion and bribery in such relationships all payments of money or things of value should

cease between employer and employee representatives except as noted in the Act, this Court should not hold that the legislative method of attempting to stamp out a not infrequent evil is unconstitutional. The inherent difficulty in proving whether such payments of money are bribery or extortion or transactions free from any inimical purpose may well have suggested to Congress the necessity of adopting the language used in this section. Practices which are wrong and harmful to labor-management relations and inimical to public welfare and those which are potentially wrong in that field, are fairly within the scope of the congressional jurisdiction. In disposing of defendants' constitutional objection to this legislation, therefore, it is not necessary to consider the marginal cases, or to labor with hypothetical situations which are not before the Court and which may perchance illustrate how acts not usually considered wrong or harmful may be, by the language of the Act, proscribed activities. The fact that, for the purpose of stamping out evils and to avoid transactions which may give rise to conflict of interests between the employer and employee representation, the Act requires a surrender of acts and conduct which may not be inherently wrong or so considered by the public, is no sound reason for striking down this legislation. Moreover, that this legislation places rigid restrictions upon certain acts as between representatives of labor and the employer of such labor, which restrictions may not be applied to individuals or concerns in other business relationships, is not repugnant to any constitutional provision when we recognize that Congress has police power in regulating labor-management relations in industries affecting interstate commerce and may legislate in this field to achieve a legitimate end. In Northwest Bancorporation v. Benson, D.C., 6 F.Supp. 704, at page 717, this Court in upholding the validity of the so-called Blue Sky legislation of this State, and citing in support of its decision the Supreme Court cases of Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480; Caldwell v. Sioux Falls Stock Yards Co., 242 U.S. 559, 37 S.Ct. 224, 61 L.Ed. 493, and Merrick v. N. W. Halsey & Co., 242 U.S. 568, 37 S.Ct. 227, 61 L.Ed. 498, stated:

"The so-called 'Blue Sky' law of Minnesota finds almost exact counterparts in many other states. Its general purpose is to protect investors in securities and to prevent any sales of securities within the state of Minnesota which will work a fraud upon the purchasers. To that end, the securities commission has been established and vested with broad powers. * * * That the exercising of such powers burdens honest business is manifest. It restricts, restrains, and in instances prohibits the doing of many things not in themselves inherently wrong. It curtails the individual's right to do as he pleases with his own property. But all of the contentions against the validity of such legislation were met and answered by the Supreme Court of the United States * *."

Substantially this same question was before Judge Palmieri, of the Southern District of New York, in United States. v. Ryan, D.C., 128 F.Supp. 128, 134. There, the defendant was indicted for violation of Section 186(b), and the conviction was sustained by the trial court. The indictment charged that on three separate occasions the defendant, while a representative of employees who were employed in an industry affecting commerce, unlawfully, wilfully, and knowingly received and accepted sums of money from the employer of such employees. The same general charges are made in the instant case. Judge Palmieri in commenting upon the constitutional objections made to this section of the statute, stated:

"That there may be marginal cases presenting difficulties of factual demarcation is not sufficient ground for striking down a statute for ambiguity. United States v. Petrillo,

1947, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877; Robinson v. United States, 1945, 324 U.S. 282, 65 S.Ct. 666, 89 L.Ed. 944. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed. Jordan v. De George, 1951, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886. The Constitutional requirement of definiteness is fulfilled where the statute gives a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by its terms. United States v. Harriss, 1954, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989. And if the statute is plainly directed to a general class of cases, it will not be struck down as vague even though marginal cases pose questions of doubt. United States v. Harriss, supra, 347 U.S. at page 618, 74 S.Ct. at page 812."

And so far as the power of Congress to legislate in this field of commerce is concerned, that question has been passed upon directly by our Court of Appeals in Hulahan v. United States, 214 F.2d 441, 445, where the court stated:

"* * * We have no doubt that Congress has power to deal with extortion or attempted extortion actually or potentially affecting interstate commerce, just as it has power to deal with unfair labor practices so affecting interstate commerce."

■ The Court concludes that this indictment should not be dismissed upon the ground that it contravenes the rights of these defendants under the Fifth and Sixth Amendments to the Constitution of the United States.

■ The third branch of the motion seeks to dismiss Counts II and III of the indictment for misjoinder. Count II charges that Connelly and Local No. 194 received and accepted a certain amount of money from an employer of certain employees represented by these defendants, and Count III makes a similar charge against Connelly and Local No. 548. Both counts allege violation of Section 186(b), 29 U.S.C.A. Defendants contend that, from the nature of the offense set forth in these two counts, only one of the named defendants can be guilty, and that therefore the counts of the indictment in reality charge these defendants in the alternative. That is, defendants contend that the money must have been kept by either one of them and that the term "to receive" as used in the Act means to keep. But that argument is not sound. The money, if paid as alleged, may have been received in violation of the Act by both defendants named in the respective counts. In any event, that issue is one of proof and cannot be disposed of on a motion to dismiss. If there is a misjoinder of defendants and offenses, the remedy to be sought is not a dismissal, but a motion for separate trials.

■ The fourth branch of the motion seeks a continuance of this matter until the September 1955 term because of the alleged inflammatory and prejudicial publicity which has taken place by reason of newspaper publications and by reason of the congressional investigation of the defendants shortly before the return of this indictment. Included in the sources of publicity is the Grand Jury's report referred to in the first branch of the motion made herein.

The indictment in this case was returned on September 17, 1954. On October 8, 1954, the defendants were arraigned, and the matter was then continued from the Fall term of this Court until the March term. Attached to the motion herein defendants have photostatic exhibits of newspaper articles printed from December 30, 1952, to January 9, 1954. It is not necessary to comment upon the nature or the propriety of the publicity to which the defendants refer. The only matter with which the Court is concerned is its effect upon the minds of the jurors at the March term of this Court. Defendants do not seek a trans-

fer of the trial to another division. Their position is that the time which will have elapsed by a continuance to the September term will aid in erasing from the minds of prospective jurors any prejudicial effect caused by the adverse publicity to which reference is made. But there is no showing that unprejudiced jurors cannot be obtained at the March term. Defendants overestimate the duration of adverse publicity in the minds of the public. The startling headlines of today are overshadowed by something equally startling tomorrow. Persons scan the headlines, and if the particular news item does not especially pertain to anything directly concerning them, they soon forget the matters referred to. This Court is clear that the time which already has elapsed since this alleged prejudicial publicity appeared will have removed as effectively any adverse effect thereof from the minds of the public as will be occasioned by the additional period requested by the continuance. In any event, it seems clear that the apprehension which the defendants have as to their inability to get a fair and impartial jury is based entirely upon conjecture and speculation. The denial of a motion for continuance for the same reason was sustained by the Court of Appeals of the Eighth Circuit in the case of Finnegan v. United States, 204 F.2d 105, 110, wherein it stated:

"* * * The mere showing that great publicity had been given the matter of the charges against defendant was certainly not sufficient to warrant this court in reversing the case on the ground of the denial of defendant's motion for continuance. * * * Finally, it may be said that newspaper publicity tending to excite public prejudice against a defendant is not usually considered as a sufficient reason for granting an application for continuance."

It follows from the foregoing that defendants' motions, and each of them, are denied in their entirety. It is so ordered. An exception is allowed.