UNITED STATES of America,

v.

Vincent J. MOTZELL, Defendant.

Cr. No. 192–60.

United States District Court
D. New Jersey.

Sept. 25, 1961.

Chester A. Weidenburner, U. S. Atty., Newark, N. J., by Frank J. Ferry, Asst. U. S. Atty., Camden, N. J., for the Government.

Toolan, Haney & Romond, by John E. Toolan, Perth Amboy, N. J., Charles H. Nugent, Camden, N. J., for defendant.

MADDEN, Chief Judge.

This is a criminal matter wherein the charges contained in a two count indictment were tried to the Court without a jury. At the close of the Government's case, defendant, through counsel, moved for judgment of acquittal which motion was held by the Court. The defense thereupon rested its case and renewed its motion. The matter was taken under advisement and briefs, which were ordered to be submitted, have now been received. Further argument has been waived.

The indictment charges violations of Section 186(b) of Title 29 U.S.C.A. in that, in the first count, the defendant being a representative of a labor union and as such represented the employees of such union working for the American Dredging Co., the Company and the employees thereof being engaged in an industry affecting commerce, did wilfully and unlawfully receive from such employer the sum of $12,029.86 between July 7, 1955 and September 20, 1956, and that the receipt of said money was not within any of the exceptions enumerated and provided for in Section 186(c) of Title 29 U.S.C.A. The second count makes a similar charge except that the sum of $3,682.47 was received from Eastern Engineering Company, Inc. between the

dates of February 29, 1956 and October 6, 1956.[1]

The Government contends that the acts of the defendant are forbidden by this language of Section 186(b):

"It shall be unlawful for any representative of any employees who are employed in an industry affecting commerce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value."

It is the further contention of the Government that the acts of defendant do not come within the exceptions to the proscribed conduct in Section 186(c), which provides: ·

"The provisions of this section shall not be applicable (1) with respect to any money or other thing of value payable by an employer to any representative who is an employee or former employee of such employer, as compensation for, or by reason of, his services as an employee of such employer * * *."

The defendant disputes his violation of the statute upon two principal grounds, first, that he was an employee of American Dredging Company, hereinafter called "American," and Eastern Engineering Co., Inc., hereinafter called "Eastern," during the times alleged in the indictment and is, therefore, exempt under the terms of Section 186(c) (1), supra, and secondly, that his actions were not wilful in violation of Section 186(d) set forth as follows:

"Any person who *willfully* violates any of the provisions of this section (186) shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both."

There is no dispute of the important facts, as the Court sees them, and they are hereinafter stated as briefly as possible:

In 1955 there was a labor dispute going on between Local 825–D of the International Union of Operating Engineers, hereinafter referred to as the "Union," and a number of dredging companies. Negotiations were going on between the parties and actually were not concluded until September, 1956, but final terms were made effective as of July 1, 1955, by formal agreement. In July of 1955, the officers of the Union, as far as it pertains to this case, were Joseph Delaney, President of the International union body, Stephen Leslie, the business agent of Local 825–D (the Union involved here) and the defendant, Vincent Motzell, assistant business agent. There were a number of other assistant business agents with duties somewhat similar to Motzell's. The dredging companies were in the main represented by Andre V. Cherbonnier, Esquire, an attorney in New York, who also acted as Labor Manager for a number of these companies. During June, July and August of 1955, the negotiators also called in the Federal Mediation and Conciliation Service. While these negotiations were going on but not completed Cherbonnier and Leslie agreed that a representative of the Union should be employed by American with a rank of Master Mechanic and paid accordingly. Such union representative was to have two main duties, first, to obtain, when requested by the Company, the personnel for employment for work on the barge· (if he failed to obtain competent personnel within 72 hours the Company had the right to hire from other sources), and, second, to discuss with the Company's designee any and all grievances or disputes arising under the provisions of the agreement. The provisions of this agreement were ultimately made a part of the formal contract of September, 1956, and in particular paragraph 25 thereof.[2]

1. While the sum of money alleged in the indictment is at considerable variance with the proofs it is felt by the Court that the amount received is not greatly

important to the disposition of the matter.

2. "25. The Hiring Engineer is to have authority to discuss with the Company's

Thereupon, on July 7, 1955, the defendant took up his duties as described hereinbefore and was carried upon the books and records of American as an employee with the classification of "Master Mechanic" and each week received an envelope, along with the other employees, which contained a check (which the Court will not characterize) which was in a sum representing his week's work with overtime; this status continued until September 20, 1956.

It is quite evident from the testimony that Motzell while a representative of the Union was not the prime or even important personage in the negotiations. These were Cherbonnier, Delaney and Leslie. Motzell was present on a great many or majority of the meetings but played little or no part therein. Cherbonnier, during his negotiations, requested or demanded that "The Master Mechanic is not to be employed by more than one Company at the same time and is to be paid a fixed agreed upon weekly rate, such rate to be agreed upon between the Union and each Company." See the letter of August 31, 1955, addressed to the various companies, including American, by Cherbonnier. This provision was not incorporated in the formal agreement.

Motzell in 1955 received a total in weekly checks of $10,866.40 and in 1956, $8,888.20 from American.

In February, 1956, Eastern Engineering Company, Inc. was formed, with offices in Atlantic City, New Jersey; Mr. Abraham Nathan was Vice President and Mr. Andrew B. Reid was President. They visited Leslie's home in North Jersey regarding union representation and securing labor, and the defendant Motzell was present. It was agreed at this meeting that Motzell was to be engaged as a Hiring Engineer by Eastern and his compensation would be $2.70 per hour on the basis of a 52 hour week. Motzell obtained the employees as needed by Eastern and represented the employees if there were any grievances. Motzell's weekly checks were sent to a Camden, New Jersey, Post Office Box.

Witnesses employed by American testified that they knew Motzell was working for Eastern, and witnesses employed by Eastern testified that they knew that Motzell was working for American. Cherbonnier, Reid and Nathan all testified, together with others, that Motzell performed services for American and Eastern, respectively, classifying them from "plain" to "very valuable."

The records of Eastern show that Motzell received from Eastern from March 1, 1956 to September 29, 1956, a total of $4,200.

In addition to the foregoing Motzell received from the Union the sum of $40 weekly. This was a sum like all other assistant business agents received to defray their travel expenses in their various areas; Motzell received this sum as expenses for traveling between Baltimore, Philadelphia, Atlantic City and New York.

Motzell left the employ of both Eastern and American at the end of September, 1956, and no explanation by the Government is given by way of testimony in this regard.

It can, therefore, be seen from the foregoing that the following elements of the crime charged are not in dispute and have been established:

designee any and all grievances or disputes arising under the provisions of this Agreement which are not settled by the Shop Steward. The Company agrees to request the Hiring Engineer to obtain the personnel in the classifications covered by this Agreement and the Union agrees that the Hiring Engineer is to obtain, when requested by the Company, the personnel in the classifications covered by this Agreement. If, however,

the Hiring Engineer does not, within 72 hours exclusive of Sundays and holidays, obtain competent and qualified personnel as and when wanted by the Company, the Company will hire from any source. The Hiring Engineer shall be agreed to between the Union and the Company and shall receive compensation from the Company at the rate of $150.00 per week."

(a) That both American and Eastern were employers of employees who were employed in an industry affecting commerce;

(b) That the defendant, Motzell, was, at all critical times as to this case, a representative of Local 825–D of the International Union of Operating Engineers and as such was a representative of the employees of both Eastern and American; and

(c) That during the times mentioned in the indictment he received money from both American and Eastern.

This leaves for the sole consideration of the Court these two questions:

(a) Was he an employee under the provisions of Section 186(c) (1) of either or both of these companies?

(b) If he were not an employee of either one when he received money therefrom, were his actions wilful under the provisions of the Act?

■ At the outset of this discussion the Court would like to make two observations. While they may not directly affect the technical guilt or innocence of the defendant as charged the Court must observe the rule of law concerning reasonable doubt that it would charge to a jury and it is extremely difficult to completely divorce one's self from such observations especially when charged under the law to give to the defendant the benefit of reasonable doubt if such exists.

■ Firstly, it is observed that under the first paragraph of Section 186, supra,[3] each of the companies involved, American and Eastern, would be guilty of paying the money if Motzell is guilty of receiving but they have not been prosecuted.

■ It is well recognized that in criminal prosecutions it is often necessary to eliminate from prosecution a few who are less guilty in order to bring to court more defendants of greater guilt, or to eliminate one in order to prosecute two or more, or where proof is unavailable unless one is eliminated, to do so. But the Court cannot see that picture here. There was no difficulty, and the Court can see none, in obtaining proof of the actions here and the Court cannot help but wonder if the evaluation of Motzell's services by Cherbonnier for American might not be different if Cherbonnier. was a defendant to either a substantive charge or a conspiracy charge. Here you have one defendant to charges which, if true, were participated in by many, and, as the Court views it, they were, to say the very least, in pari delicto.

The second observation is that of all the cases presented to the Court in the Government's brief, together with all cases this Court has been able to find of itself, there is no case wherein the facts are similar to the facts in the case at bar. None of the cases have a feature of employment, but only occasional payments or loans or doing of other things of value usually in a surreptitious fashion in an attempt to hide or put under a different cloak or label the true nature of the payment made. This includes the Ryan case [U. S. v. Ryan, D.C.S.D.N.Y. 1955, 128 F.Supp. 128; reversed 2 Cir., 1955, 225 F.2d 417; reversed 1956, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335; on remand 2 Cir., 1956, 232 F.2d 481] and continues on down to the matter recently decided by the Court of Appeals for this (3rd) Circuit, U. S. v. Baker, 293 F.2d 613.

It is, therefore, obvious that this Court has no decision on all fours with the facts here to guide it as a precedent and must view actions of the defendant with respect to those cases which throw light upon the acts of the defendant, Motzell, and those cases rendering judicial expressions regarding the intent of Congress and the purpose of the Act.

We will deal first with Motzell's relation with American. In this set of facts we do not have before us the activities of

3. "(a) It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce."

the top man (Delaney) or even the second in command (Leslie) who were the ones possessing the bargaining power and authority to deal with American in its labor relations with the Union. Motzell had little, if any, authority in that respect. The agreement which placed Motzell on American's payroll was not reached by Motzell but by Delaney and Leslie in dealing at arms length with Cherbonnier. Motzell performed a service, i. e., supplying employees when requested by American and representing the employees when questions arose or grievances occurred. He was paid weekly by check with income tax and social security payments being withheld. He was listed as an employee with the Workmen's compensation insurance carrier which accordingly increased American's compensation premiums. Is this the kind of practice forbidden by Section 186 or is this within the confines of the exceptions and a legitimate labor practice under the provisions of the Act?

This Court is extremely mindful of the difficulty of there being a meeting of the minds of judges upon the question of what is a legitimate labor practice and what is illegitimate or illegal. The Court cites U. S. v. Kemble, 3 Cir., 1952, 198 F.2d 889, where after a conviction before this Court of an individual defendant and the Union under the Hobbs Act, 18 U.S. C.A. § 1951, the Court of Appeals sat in banc and out of seven members there were written and filed four opinions. This, naturally, is not said in criticism in the slightest degree but merely by way of illustration of the differences of opinion upon this particular subject.

The Court, likewise, has in mind that the Act under which we are considering this matter, passed in 1947, was amended in 1959 regarding the exemptions of employees, as follows (Section 186(c)(1)):

"The provisions of this section shall not be applicable (1) in respect to any money or other thing of value payable by an employer to any *of his employees whose established duties include acting openly for such*

*employer in matters of labor relations or personnel administration or to any representative of his employees, or to any officer or employee of a labor organization, who is also an employee or former employee of such employer,* as compensation for, or by reason of, his service as an employee of such employer." (Emphasis supplied.)

In the matter of United Marine Division v. Essex Transportation Co., 216 F. 2d 410 (Nov. 3, 1954), the Court of Appeals for this Circuit reversed the holding of the District Court that payment by the defendant-company of money to a pension trust for employees would be contrary to Sections 186(a) and (b), and said this, at page 411:

"We approach the question with the thought in mind that these welfare funds represent a social device to be encouraged. See Upholsterers' International Union of North America v. Leathercraft Furniture Company, D.C.E.D.Pa. 1949, 82 F.Supp. 570. We are also conscious of the fact that abuses in the use of these funds had been the subject of public discussion. It was thought that in some instances employers had been induced to agree to pay into welfare funds over which they had no control and, indeed, over which members of the union itself had no knowledge or control. This appears quite clearly in the discussion of this portion of the Taft-Hartley Act when the matter was before the Congress."

And further, at page 413:

"We think that the promise in this case is outside the evil which the Congress was endeavoring to erase in the sections of the statute which we have quoted. Since the fact situation is outside that evil, we do not think we should enlarge an application of the statute to void the type of arrangement which has met with legislative sanction, judicial approval and is a growing trend in employer-employee relations.

"The judgment of the district court will be reversed and the case remanded for further proceedings not inconsistent with this opinion."

In 1957 the Court of Appeals for the First Circuit, in the matter of Coppus Engineering Corp. v. National Labor Rel. Bd., 240 F.2d 564, said at page 573:

"We believe that the use of company property, and even time, for employee meetings, in the circumstances of this case, does not constitute substantial evidence on the record as a whole of support or domination. Chicago Rawhide Mfg. Co. v. National Labor Relations Bd., supra [10 Cir., 221 F.2d 165]; National Labor Relations Board v. Valentine Sugars, 5 Cir., 1954, 211 F.2d 317. This evidence shows no more than cooperation by petitioner and a possibility of company control. However, 'neither mere cooperation, preference nor possibility of control constitute unfair labor practices; and the Board may not infer conduct that is violative of the Act from conduct that is not, unless there is a substantial basis, in fact or reason, for that inference.' Chicago Rawhide Mfg. Co. v. National Labor Relations Bd., supra, 221 F.2d at page 168. The sections of the Act before us were 'not enacted to prohibit or penalize courteous and friendly, or even generous, actions on the part of employers.' National Labor Relations Board v. Valentine Sugars, supra, 211 F.2d at page 320."

Early this year, in the matter of United States v. Lippi, 190 F.Supp. 604, at page 607, Chief Judge Caleb Wright of the District of Delaware, in speaking of the section here under consideration, had this to say:

"Another independent ground for a new trial may exist. The Court has ruled that if defendant was a legitimate stockholder in the Coal Co., his receipts of dividends would not be violative of 29 U.S.C.A. § 186 (b). This conclusion is confirmed by a review of the legislative history. Most of the debate focused upon problems resulting from governmental regulation of pension and welfare funds. The prohibitions on receipt by union officers of money from employers at best was intended to reach only certain forms of bribery and extortion and was not designed to be a sweeping regulation or prohibition of all forms of conflict of interest. * * *"

And, again, early this year Chief Judge John Murphy of the Middle District of Pennsylvania, in the matter of United States v. Alaimo, 191 F.Supp. 625 at page 627 said of this section:

" 'The chief, if not only, purpose of the section was to put a stop to practices that, if unchecked, might impair the impartiality of union "representatives",' United States v. Ryan, supra, [2 Cir.], 232 F.2d at page 483; 'to prevent employers from tampering with the loyalty of union officials, and disloyal union officials from levying tribute upon employers,' * * *."

■ This Court, therefore, concludes, in the light of these decided cases and the Court's interpretations of what the purposes of the Act were, that the activities of Motzell in regard to his dealings with American, as set forth in the first count of the indictment, were legitimate labor practices, as a result of open dealings between management and labor, and were not designed by the Union as an intimidation or extortion of the company nor an attempt on the part of the company to bribe the union official here involved, Motzell, or to gain control over the Union. Accordingly the defendant, Motzell, will stand acquitted upon the first count.

This Court is not of such an explicit opinion regarding the defendant's position in his dealing with Eastern. It would seem that under the exceptions of this Act, as the Court has found, one could indulge in such activities for one employer and not run afoul of the Act because one would be classified as an employee. But could one, being a representative of a labor union and the em-

ployee members thereof, escape conflict with the Act upon the grounds of being an employee under the exception provisions, if he is actually carried upon the books and records of more than one company at the one and the same time?

It is true that there are instances where a man can with all propriety be engaged in two separate employments at the one and the same time. The practice is, unfortunately, increasing due to our economy, where to make ends meet men have more than one employment. But these secondary employments are so-called after hour or week-end jobs, not performed at the one and the same time that the employee is performing work for the other employer.

It is, likewise, true that in this particular instance Cherbonnier was working for more than one company or client. But there is a great difference. Cherbonnier was being paid by his clients while Motzell, representing the employee members of the Union, was being paid by the Company employer.

■ If this practice (i. e., working for two employers) would be approved as not contravening the statute, where, along the line would it stop? Some would argue that one could indulge in such activities for two companies, some would say five, some would say ten. It is this Court's opinion that such a practice could and would constitute a form of extortion by a union upon a company or companies that the Act is designed to forbid. The Court, therefore, concludes that the actions of the defendant, Motzell, as pertains to the second count, were proscribed by the Act and we, therefore, come to the question of whether such actions were wilful.

In determining that we, naturally, must look at the entire picture. The actions covered a period of fourteen or fifteen months. They were out in the open. There was no attempt to hide or to term the payments anything other than what they were. The defendant was not the chief negotiator for the Union or even the second in command for that matter.

The Government relies heavily upon U. S. v. Ryan, supra. It is well, giving the defendant the benefit of the doubt as the law compels us, to keep in mind that the Ryan case was moving a course that, to say the least, was not the smoothest. On January 24, 1955, Ryan was pronounced guilty by the trial judge (128 F.Supp. 128). On July 1, 1955, the Court of Appeals of the Second Circuit reversed the conviction (225 F.2d 417). On February 27, 1956, the United States Supreme Court reversed the action of the Court of Appeals and remanded the case to that Court for study and consideration of other points (350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335). Finally, on April 26, 1956, the Court of Appeals affirmed the conviction on a finding of wilfullness (232 F.2d 481).

■ In speaking of this particular statute and the application of the term "wilful," the Court of Appeals for the Tenth Circuit in the matter of Korholz v. United States, 1959, 269 F.2d 897, at page 902, approved the following charge to the jury by the trial court:

" 'Before there can be a conviction in this case it must be established beyond a reasonable doubt that acts charged in the indictment and in violation of the statute were done knowingly and wilfully. Now, the word 'knowingly' as used in the indictment, as used in these instructions means intentionally and with an awareness and consciousness of what one is doing. Now, the word 'wilfully' as used in the statute and in the indictment and in these instructions connotes an intentional violation of the law, and you are advised, ladies and gentlemen of the jury, that a defendant who actually does violate the provisions of law here involved would not be guilty of a criminal offense unless he is either conscious of the fact that what he is doing constitutes a violation of the law or unless he wholly disregards the law and pursues a course without making any reasonable effort to determine whether the plan he is fol-

lowing would constitute a violation of the law or not.' "

I think it should be borne in mind that this original hiring with American was entered into in July, 1955 (the date alleged in the indictment is July 7, 1955) shortly after the decision of the Court of Appeals of the Second Circuit on July 1, 1955, wherein the conviction of Ryan was reversed; and that Motzell discontinued this practice in September, 1956, shortly after the conviction of Ryan was finally reinstated which was on April 26, 1956.

Recently the United States Supreme Court had before it the matter of James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246, wherein the question was "whether embezzled money is taxable income of the embezzler in the year of embezzlement under the income tax laws?" In 1946, in Commissioner v. Wilcox, 327 U.S. 404, 66 S.Ct. 546, 90 L. Ed. 752, the Supreme Court had held that it was not. In the James v. U. S., supra, case, decided May 15, 1961, the Court held that embezzled money was taxable income thus reversing the holding in Wilcox, but at the same time holding that as far as the James case was concerned, inasmuch as he could have relied upon the law as enunciated in the Wilcox decision, he (James) could not have been "wilful" in his violation of the law (366 U.S. at page 221, 81 S.Ct. at page 1057, 6 L.Ed.2d 246):

> "We believe that the element of willfulness could not be proven in a criminal prosecution for failing to include embezzled funds in gross income in the year of misappropriation so long as the statute contained the gloss placed upon it by Wilcox at the time the alleged crime was committed. Therefore, we feel that petitioner's conviction may not stand and that the indictment against him must be dismissed."

Under these circumstances, with the gloss placed upon the statute in question by the Ryan and other cases and no particular case having held that the facts (presently under consideration)

constitute a violation of said statute, the Court cannot say that after full and fair comparison of all of the evidence that it has an abiding conviction to a moral certainty of the wilfulness of the defendant Motzell's actions. In this state of the case the law holds that a reasonable doubt exists and as it is one of the necessary elements of the crime, the defendant is entitled to a judgment of acquittal on the second count.

Counsel will prepare an appropriate order.