**UNITED STATES of America,**
**Plaintiff,**

v.

Sidney L. BRENNAN, Eugene J. Williams, aka Gene Williams, Jack J. Jorgensen, Gerald P. Connelly, aka Jerry Connelly, James W. Moore, and Archer-Daniels-Midland Company, a corporation, Defendants.

Cr. No. 8658.

United States District Court
D. Minnesota, Fourth Division.

Sept. 6, 1955.

Elmer J. Ryan, St. Paul, Minn., Edw. B. Williams, Washington, D. C., for Brennan.

Irving Nemerov, Minneapolis, Minn., for Connelly.

Melvin H. Siegel, Minneapolis, Minn., for Williams.

Thomas Kachelmacher, Minneapolis, Minn., for Jorgensen.

Pierce Butler, St. Paul, Minn., Faegre & Benson, Minneapolis, Minn., for Archer-Daniels & Moore.

Geo. MacKinnon, St. Paul, Minn., for plaintiff.

DEVITT, District Judge.

The defendants herein are charged with having violated 29 U.S.C.A. § 186 (a), (b) and (d), the Taft-Hartley Law, which makes it unlawful for an employer to pay, and for any representative of employees to receive, money from the employer.

In response to the indictment, the defendants have filed a total of 34 motions. The principal issue raised by the motions is as to the meaning of the term "representative" as used in the Law. The issue is of substantial importance, and has recently been the subject of judicial dissension in the United States courts.

Two schools of thought have arisen as to the meaning of the term "representative." The first view is that expressed by United States Circuit Judge Learned Hand in the dissenting opinion in the case of United States v. Ryan, 225 F.2d 417 decided July 1, 1955, and by United States District Judge Palmieri in the case of United States v. Ryan, 128 F.Supp. 128, decided in the Southern District of New York on January 24, 1955. This view holds that Congress, in using the term "representative" in Section 186 (a) and (b) of the Law, intended to cover, in the ordinary sense of the term, any responsible representative of labor who represents employees employed in an industry affecting commerce.

The second school of thought is represented by a reversal of the Palmieri decision by the United States Circuit Court of Appeals for the Second Circuit in the case of United States v. Ryan, supra, in which the majority opinion was written by Judge Frank (Judge Swan concurring, Judge L. Hand dissenting). The views expressed in this opinion adopt a strict or narrow interpretation of the term "representative" as used in the Taft-Hartley Law. Judge Frank held that the term "representative" was a word of art, having a restricted meaning as applying only to a representative (labor union or individual) who represented the union in a collective bargaining relationship with the employer.

Both the government and the several defendants, in lengthy briefs and by extensive oral argument, dissect the statutes, trace the social and economic history immediately preceding the enactment of the Labor-Management Relations Act of 1947, Taft-Hartley Law, and explore the legislative history and Congressional debates and come out, each with his own conclusion, as to the proper meaning of the term as used by the Congress.

This Court is adequately persuaded that the Hand-Palmieri view of the meaning of the term "representative" is the preferable one, reflective of the language employed, more consonant with the broad Congressional purpose for the enactment of the Law, consistent with

the legislative history and, above all, expressive of the plain, common sense of the matter.

The defendants herein are charged with having violated, and some of them, with conspiracy to violate, Section 186 (a), (b) and (d) of the Act, 29 U.S.C.A. § 186(a), (b), (d). Those sections read as follows:

"(a) It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce.

"(b) It shall be unlawful for any representative of any employees who are employed in an industry affecting commerce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value.

\* \* \* \* \* \*

"(d) Any person who willfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both."

The defendants move to dismiss the indictments on the theory that, assuming the payment of money as charged, it was not paid by the employer to "any representative of any of his employees". So the basic issue is whether or not the defendants Brennan, Williams and Jorgensen fall within the quoted clause.[1]

The indictment specifies that each of these named defendants is a labor union official occupying various positions which on their face, import positions of importance and authority, of unions, the members of which are employed by the Archer-Daniels-Midland Company.[2]

At first blush, therefore, it appears that these labor leaders are responsible representatives of unions, the members of which are employed by the corporate defendant in (admittedly) an industry affecting commerce.

The indictment consists of a conspiracy charge in Count 1, supported by 19 overt acts, and four substantive Counts against the Archer-Daniels-Midland Company, Brennan, Williams and Jorgensen. The essence of the facts alleged is that between approximately January 1, 1953 and November 8, 1954, the employer, Archer-Daniels-Midland, through its vice president, James W. Moore, paid $5,000 to Brennan, Williams, Jorgensen and Connelly, at or near the same time that Moore, acting for the Archer-Daniels-Midland Company, had a conversation with Brennan and Connelly concerning the possibility of Brennan and Connelly inducing the Archer-Daniels-Midland employees at the Southeast Minneapolis Oil Mill and Elevator to switch their membership from the United Mine Workers Union to the Local Union affiliated with the Brotherhood of Teamsters. The money was paid by one George Rutman to Gerald J. Connelly (son of Gerald P. Connelly, defendant) in the form of a check payable to "National Sales Representative," a fictitious and pretended business entity, and that said Gerald J. Connelly in turn paid the defendants Brennan, Williams and Jorgensen each $1,000, Gerald P. Connelly $900, and presumably retained the remaining $1,000 for himself. At a later date George Rutman was reimbursed the $5,000 by the Archer-Daniels-Midland Company.[3]

---

1. Connelly and Moore are charged with causing and abetting the alleged crime in violation of 18 U.S.C.A. § 2.

2. The indictment sets out the union offices held by the defendants and adds that each occupies "other internal positions." Indictment Count 1, Paragraphs 8, 9 and 10; Count 2, 1(g), (h), (i). The labor organizations allegedly involved and their functions and interrelations are set out in the Indictment Count 1, Paragraphs 2, 3, 4, 5 and 6; Count 2, 1(b) (c), (d), (e) and (f).

3. George Rutman was not indicted by the Grand Jury. He has been referred to in the briefs and arguments as the "unindicted co-conspirator."

■ An apparent purpose of Section 186(a), (b) and (d) from a reading of it and also from a reading of the new section added to the preamble to the so-called Wagner Act (reenacted. by the 80th Congress) by the Taft-Hartley Law, is to preserve the integrity of the labor-management relationship by prohibiting bribery, extortion or any form of dishonesty as between employer and employees.[4]

The so-called "Findings and declaration of policy" set out in Section 151, 29 U.S.C.A. § 151, contains this addition to the former preamble, which significantly includes an allegation of past improper activities of some union officers, and a statement of intention to eliminate such practices:

"Experience has further demonstrated that certain practices by some labor organizations, *their officers,* and members have the intent or the necessary effect of burdening or obstructing commerce by preventing the free flow of goods in such commerce through strikes and other forms of industrial unrest or through concerted activities which impair the interest of the public in the free flow of such commerce. *The elimination of such practices is a necessary condition to the assurance of the rights herein guaranteed."* (Italics supplied.)

■ If, as is alleged, the Archer-Daniels-Midland Company through its vice president, James W. Moore, paid $5,000 to these labor leaders of employees then working for the Archer-Daniels-Midland Company, at a time when the employer had an apparent interest in a "switch" of union affiliation, in the secret and circuitous manner stated, and not for a legitimate business purpose, it appears that such an act is of the kind contemplated to be prohibited by the Taft-Hartley Law, and that the indictment which alleges these facts states a cause of action.

But all of the defendants urge that when the Congress used the term "any representative of" employees, it did not mean that it covered "any representative", but only a special class of representative, to wit, one who was at the time the official bargaining representative of the union. In support of this view they refer us to the definition of the term contained in 29 U.S.C.A. § 152. It provides that:

"The term 'representatives' includes any individual or labor organization."

As a passing comment, it is significant to me, in searching for Congressional intent, that this definition says that the term representative *includes* any individual or labor organization; it does not say that it means *only* an individual or labor organization, thus indicating a purpose to use the term in a broad sense. See State v. Standard Oil Co., 1912, 61 Or. 438, 123 P. 40.

---

4. Judge Learned Hand, in his dissenting opinion in the Ryan case, stated that, by enacting Sec. 186, " * * * Congress wished to prevent employers from tampering with the loyalty of union officials, and disloyal union officials from levying tribute upon employers. * * * "

It is also noteworthy that William Green, in appearing before the Senate Committee, analyzed provisions of Sec. 201, S. 55 as clearly covering the bribery of union officials. He said "Sec. 201 of Title 2 of S. 55 apparently is an attempt to prevent bribery of union officials and to restrict and regulate the establishment of so-called welfare funds. These objectives are achieved by a blanket and sweeping prohibition against contributions or payments of any sort by employers to unions or union representatives, followed by an enumeration of certain limited exceptions to the prohibition * * * " Statement filed by William Green, President of the American Federation of Labor, Hearings on S. 55 before Committee on Labor and Public Welfare, U. S. Senate, 80th Congress, 1st Session, page 1041.

The defendant Connelly apparently recognized this purpose of the Law in a previous charge brought against him. See U. S. v. Connelly, D.C., 129 F.Supp. 786 at page 789. The argument made here as to the meaning of the term representative was not advanced in that case.

With this statutory definition in mind, defendants urge that Congress contemplated prohibiting only the union itself (or in rare cases an individual acting in the same capacity), which conducts collective bargaining, from accepting money or a thing of value from the employer; the prohibition does not extend to Union officers or any other kind of representative. To buttress this contention they discuss the sense in which the term is used in subsequent sections of the Law, particularly Sections 157, 158 and 159.

■ It is true that in those sections of the Law the term is employed in references to a representative who is engaged in collective bargaining activities. But this is only natural because one of the principal purposes of the Taft-Hartley Law is to set up effective collective bargaining machinery, and much of the language in the Act is devoted to the mechanics regulating collective bargaining—hence the numerous references to it and the use of the term "representative" in connection therewith.

It doesn't follow that the term "representative" has the limited meaning urged merely because it is used so often in connection with collective bargaining. The definition, in Sec. 152 of the Law, says that it *includes* that meaning. But this does not mean that it *excludes* the employment of the word in its common ordinary meaning. Other sections of the Law use the term in a non-collective bargaining sense. See for instance Section 158(b) (1) (B), 29 U.S.C.A. § 158, where the term is obviously used in reference to a person selected by the *employer* for the purpose of collective bargaining or adjustment of grievances; Section 181(a), 29 U.S.C.A. § 181(a), where the Bureau of Labor Statistics is required to maintain a file of copies of labor agreements for the guidance and information "of *interested representatives* of *employers, employees,* and *the general public*"; Section 181(b), 29 U.S.C.A. § 181(b), where the Bureau of Labor Statistics is authorized to furnish certain data and factual information to "* * * *employers, employees,* or *their representatives* * * *[5]

The Taft-Hartley Law is a comprehensive enactment covering the field of labor-management relations and it reenacted the former Wagner Act with amendments. Hence, when studying the sense in which the term "representative" is used, we must examine the entire Law, not just the reenacted provisions of the Wagner Act.

It must be remembered that it is the penalty statute, Section 186, that is allegedly violated in this case, and that section is expressive of the broad intent contemplated by the Congress when it used the all-inclusive "any" in the expression "any representative" is prohibited from receiving money.

As previously observed, it was one of the apparent purposes of Congress, in enacting Section 186, to preserve the integrity of a proper labor-management relationship, and especially of the collective bargaining procedures set up in the Law, by prohibiting bribery, and extortion. But it is individuals, not organizations such as labor unions, who normally commit such offenses. Bribery, extortion

---

5. The government's brief, pages 30 to 39 inclusive, contains an exhaustive examination of the sense in which the term "representative" is used some 48 times in the five separate titles of the Taft-Hartley Law. It is urged therein that: "* * * whenever Congress intended to refer to a *bargaining* representative that it accomplished that result by adding various limiting and qualifying words and phrases, such as '*bargaining* representative'; 'representatives of employees *as provided in Section 9(a)* hereof'; 'representatives for the purpose of *collective* bargaining'; 'representative of such employees *whom such employer is required to recognize under this Act*', etc. This makes it plain that Congress recognized that the mere use of the word 'representatives' would not refer to *bargaining* representatives, but instead would convey the ordinary meaning usually conveyed by the word 'representatives', and hence whenever they wished to convey a different impression they did so by the context."

and similar crimes are transgressions normally engaged in for *personal* profit. Can it be logically said that Congress had the very limited purpose of prohibiting these wrongs only by unions [in the rare cases where they would be committed for the benefit of the unions], and did not have the purpose of making it criminal for the responsible officers of those unions to commit such offenses? If so, it would have the effect of encouraging individual wrongs while punishing such acts only if the whole membership of the union profited thereby collectively —a discrimination without either sense or justification.

The government makes an interesting and forceful contribution to the unwanted result that would follow from the defendants' interpretation of the law.

It points out that many of the welfare funds (i. e. United Mine Workers Fund) sought to be regulated by the law were administered by trustees who were either individuals or a union (such as a national union) *not* engaged in collective bargaining and, if the narrow interpretation of "representative" is to be adopted as urged, the interdictment of the statute will not cover such trustees who control the funds because they are not collective bargaining representatives. And thus a large loophole in the law emerges to frustrate the principal purpose for its enactment. Hence, the senselessness of the "artful" interpretation and the sensefulness of the ordinary interpretation of the meaning of the term "representative."

Both the government and the defendants spend considerable time in their briefs in tracing the legislative history of Section 186 in an effort to determine the Congressional intent behind the Law.

The defendants urge that the legislative history indicates an intent to use the term "representative" as applying only to collective bargaining representatives and not to "any representative" in the broad sense of the term. This conclusion is supported, they say, by the action of the Joint Conference Committee, which ironed out the differences between the Senate and House Bills in deleting the broad definition of the term as contained in the Senate Bill (inserted there, with other provisions, by a floor amendment), and substituting a provision giving the term the meaning set out in Section 152.

It is true that the definition of the term as contained in the Senate Bill, which would have unmistakably covered these representatives in the broad sense, was deleted in favor of the definition by reference to Section 152, but it does not follow that this action has the significance which the defendants attach to it. As previously noted, it was one of the purposes of the proposed bill, as reflected in the report of the hearings and the Congressional debates, to cover bribery and extortions by individual labor leaders. There is no evidence that this purpose was ever abandoned nor was there apparent reason for abandoning it. I interpret the action of the Conference Committee in substituting the Section 152 definition for the one contained in the Senate Bill as an effort to achieve workmanlike draftsmanship and to unify the variable expressions of the two Houses of Congress. That this was a mechanical change of only minor import is reflected in the Report of the House Conferees on the bill where, in discussing Section 186, it is stated that the Conference "adopts the provisions of the Senate amendment with minor clarifying changes." H.R. Report No. 510, Conference Committee Report, U. S. Code Congressional Service, 80th Congress, First Session, 1135.

When the Conference Report was considered in the Senate (it used the House report in its deliberations), it is also apparent that the action of the Conferees in dealing with Section 186 was recognized as of a mechanical nature in the interest of good draftsmanship. Senator Taft stated that the Conferees "did not yield" in any important respect, and that "the bill represents substantially the Senate Bill." 93 Congressional Record 6593.

The principal differences between the Senate bill and the Conference agreement were detailed in summary fashion by Senator Taft beginning at page 6598 (93 Congressional Record 6598). With reference to Section 186 (302 of the Bill) he reported the adoption of the *Senate* amendment dealing with welfare fund operations "with some clarifying changes." See page 6603.

Certainly a purpose to exempt individual labor leaders from the sanctions of the law would not be a "minor clarifying change" as it was viewed by the House or as "some clarifying change" as it was viewed by the Senate. I conclude that this legislative record, far from supporting the theory of the defendants, indicates a Congressional purpose to persist in its desire to prescribe a broad prohibition against any form of dishonesty by either the unions themselves or by their responsible officers.

■ I am satisfied from a reading of Section 186, in the light of the whole Taft-Hartley Law, the preamble to it and the significant amended preamble to the reenacted Wagner Act, and from a consideration of the broad purpose sought to be achieved by the Law, that the Congress meant to include in the term "representative" not just those engaged in collective bargaining activities as urged by defendants, but also any responsible representative of a labor union whose members worked for an employer engaged in interstate commerce.

There remains for consideration the several motions of the defendants directed at other aspects of the indictment. These will be considered collectively by subject matter.

### Constitutionality.

■ All of the defendants urge that the indictment be dismissed because the statute allegedly violated is unconstitutional as not being within the legislative power of Congress and as violative of the Fifth and Sixth amendments to the Constitution of the United States because of vagueness and uncertainty regarding the offense charged and the standard of guilt.

A succinct statement of the constitutional test of the adequacy of a criminal statute attacked for indefiniteness is found in United States v. Harriss, 1954, 347 U.S. 612, at page 617, 74 S.Ct. 808, at page 812, 98 L.Ed. 989. The Supreme Court there stated as the applicable rule:

"The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."

This test has likewise been approved by the Court of Appeals for the Eighth Circuit in their recent decision in United States of America v. Goldberg, 8 Cir., 1955, 225 F.2d 180, and related cases.

Applying this test to the statute in question, the Court concludes that the law is constitutional. The arguments made against its constitutionality are fully discussed and answered in detail by two recent United States District Court decisions. One of them is from this district. United States v. Connelly, D.C.Minn.1955, 129 F.Supp. 786 (an earlier prosecution of one of the defendants in the instant case for another but similar transaction to that alleged in the present indictment); and United States v. Ryan, D.C.S.D.N.Y.1955, 128 F.Supp. 128, reversed on other grounds, 2 Cir., 225 F.2d 417.

### Failure to State Facts Sufficient to Constitute an Offense.

All of the defendants urge that the indictment should be dismissed because it fails to state facts sufficient to constitute an offense.

Rule 7(c) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., requires that the indictment " * * * shall be a plain, concise and definite

written statement of the essential facts constituting the offense charged. * * * "

■ The sufficiency of indictments has been considered by the Court of Appeals for this circuit as recently as August 8, 1955, at which time decision was rendered in United States v. Goldberg, supra. The court in that case, considering the sufficiency of an indictment charging violation of alcohol tax statutes and regulations, quoted from Hagner v. United States, 1932, 285 U.S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861, to the effect that the proper test of the sufficiency of an indictment is as follows:

" ' * * * The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, "and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.' * * * " 225 F.2d 184.

This is a recognized and settled test of the sufficiency of an indictment. The indictment in this case consists of 17 pages of detailed charges against the defendants. I am satisfied from a reading of it that it adequately meets the test of sufficiency set out by the Supreme Court.

### Motions for Separate Trials and Election.

■■ Defendants Brennan, Archer-Daniels-Midland and Moore move for separate trials. Brennan asks that Counts 1 and 3 be tried separately. The employer defendants, Archer-Daniels-Midland and Moore, ask that their trial be separate from the labor leader defendants. Basically, the question raised by these motions is whether the government acted properly in joining all of these parties and acts in one indictment, since Rule 13 of the Federal Rules of Criminal Procedure provides that several indictments may be tried together if the offenses and defendants could have been joined in a single indictment. The joinder of offenses and of defendants is governed by Rule 8 of the Federal Rules of Criminal Procedure. It reads as follows:

"*(a) Joinder of Offenses.* Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

"*(b) Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

The test prescribed by this Rule is whether the offenses and defendants are linked together by their participation in a common transaction or act. Cataneo v. United States, 4 Cir., 1948, 167 F.2d 820. The acts of planning and carrying out the scheme of payments by the employer to labor leaders as alleged in the indictment appear to the Court to constitute various elements in a single transaction of the very kind contemplated by the framers of the Rule permitting the joinder of offenses and defendants.

■ The defendants go further and urge the Court to exercise its discretion under Rule 14 to grant separate trials because of prejudice which will come from a joint trial, and especially because evidence admissible against some defendants, while not admissible against them, will be misconstrued by the jury as against them. But the Court may issue cautionary instructions to prevent any

**52**

prejudice to these defendants and thus insure fairness. See United States v. Harris, 7 Cir., 1954, 211 F.2d 656, 659, certiorari denied 348 U.S. 822, 75 S.Ct. 34; Robinson v. United States, 1954, 93 U.S.App.D.C. 347, 210 F.2d 29; Hall v. United States, 1948, 83 U.S.App.D.C. 166, 168 F.2d 161, 163, 4 A.L.R.2d 1193, certiorari denied 334 U.S. 853, 68 S.Ct. 1509, 92 L.Ed. 1775; Cataneo v. United States, supra, 167 F.2d at page 824; United States v. Fradkin, 2 Cir., 1935, 81 F.2d 56, 59, certiorari denied 297 U.S. 720, 56 S.Ct. 598, 80 L.Ed. 1005.

It might well be to the tactical advantage of each defendant to be tried separately, but the rules prescribe a joint trial where no prejudice results therefrom. I do not think any prejudice will result from a joint trial.

■ In response to the motion of Archer-Daniels-Midland, Moore and Connelly for an election of offenses, it appears that the indictment charges only one offense, to wit, the violation of Section 186(a), 29 U.S.C.A. § 186(a), and hence no election is necessary. I do not read the allegations of paying the money and causing it to be paid as constituting two separate offenses; similarly, the allegations of causing the payment of the money and abetting the payment of it are not separate offenses. See 4 Barron & Holtzoff, Federal Practice and Procedure, Section 1931 and cases cited therein.

### Grand Jury Proceedings

The defendant Brennan moves for a dismissal of the indictment, for a bill of particulars as to what occurred at the Grand Jury sessions at which he was indicted, and for permission to examine the minutes and records of those proceedings—all on the grounds that the proceedings of the Grand Jury were irregular, improper and prejudicial to him.

The operations of the Grand Jury are governed by Rule 6 of the Federal Rules of Criminal Procedure. Subdivision (e) of that Rule provides for secrecy of the proceedings of the Grand Jury. These proceedings may be disclosed "at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury."

■ The defendant Brennan has made no such showing here. It is not alleged that there was no competent evidence before the Grand Jury upon which to base an indictment. The allegation made is a general one as to some alleged irregularity in the proceedings of the Grand Jury.

■ There is a strong caveat against the needless intrusion upon the indispensable secrecy of Grand Jury proceedings. United States v. Johnson, 1943, 319 U.S. 503, 513, 63 S.Ct. 1233, 87 L.Ed. 1546; United States v. Holmes, 3 Cir., 1948, 168 F.2d 888, 890.

■ A strong and positive showing is required of persons seeking to break the seal of secrecy surrounding Grand Jury proceedings. Otherwise the mere allegation of irregularity would open the minutes to public scrutiny. United States v. Brumfield, D.C.W.D.La.1949, 85 F.Supp. 696; United States v. American Medical Ass'n, D.C.1939, 26 F.Supp. 429.

### Bills of Particulars.

Defendants through their motions for bills of particulars present a wide variety of requests for information.

■ This Court has had recent occasion to consider the proper scope of bills of particulars in its decision in United States v. Pillsbury Mills, Inc., D.C.Minn.1955, 18 F.R.D. 91. As the Court noted in Pillsbury, it is well settled that the purpose of bills of particulars is to inform defendants of the specific nature of offenses of which they are charged. United States v. Foster, D.C. S.D.N.Y.1948, 80 F.Supp. 479; United States v. McKay, D.C.E.D.Mich.1942, 45 F.Supp. 1001. Likewise, another purpose of such bills is to avoid or minimize the danger of surprise to defendants. See United States v. Onassis, D.C.1954, 125 F.Supp. 190, 213; United States v. Allied Chemical & Dye Corp., D.C.S.D. N.Y.1941, 42 F.Supp. 425, 428. A bill of particulars should be recognized not

only as an instrument to produce additional information but also as one which has the concurrent effect of limiting the scope of government proof at the trial. See Braatelien v. United States, 8 Cir., 1945, 147 F.2d 888, 892; United States v. Greater Kansas City Retail Coal Mines Ass'n, D.C.W.D.Mo.1949, 85 F.Supp. 503, 512; United States v. McKay, D.C.E.D. Mich.1942, 45 F.Supp. 1001, 1004.

A bill of particulars is not designed for, nor should it be used to compel, the government to disclose in detail the evidence which it intends to use at trial. See Johnson v. United States, 5 Cir., 1953, 207 F.2d 314, 320, certiorari denied 347 U.S. 938, 74 S.Ct. 632, 98 L.Ed. 1087; Nye & Nissen v. United States, 9 Cir., 1948, 168 F.2d 846, 851, affirmed 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919; United States v. Rainey, D.C.W.D.Mo.1950, 10 F.R.D. 431, 433; United States v. Kansas City Retail Coal Mines Ass'n, supra.

The principle to be deducted from the decided cases is that a bill of particulars cannot be used to obtain evidence. Such seems to be the purpose of the requests of the defendants.

For instance, defendants ask for the names of certain employees of Archer-Daniels-Midland Company. This is evidentiary matter. And the information is presumably within the knowledge of the defendants and hence not proper information to be sought by a bill of particulars. See United States v. Skidmore, 7 Cir., 1941, 123 F.2d 604, 607, certiorari denied 315 U.S. 800, 62 S.Ct. 626, 86 L.Ed. 1201; United States v. Trownsell, D.C.N.D.Ill.1953, 117 F.Supp. 24.

As a further example, defendants ask for particulars as to the manner in which Connelly and Moore did aid, abet, conceal, command, induce, procure and cause Archer-Daniels-Midland Company to commit the offense charged. This is a matter of evidence for the government to present at the time of trial.

Further, the defendants ask for details concerning the alleged deliveries of money by Archer-Daniels-Midland Company and Moore and for specifications as to the circumstances surrounding the execution of the contract whereby the funds were purportedly transmitted from the employer to the named labor leaders. These requests, too, seek evidentiary matters.

The defendants ask the government to furnish a list of government witnesses to be used at the trial. The defendants are not entitled to this information since this is a non-capital offense. United States v. Wilson, D.C. W.D.Mo.1947, 72 F.Supp. 812, affirmed Klein v. U. S., 8 Cir., 176 F.2d 184, certiorari denied 338 U.S. 870, 70 S.Ct. 145, 94 L.Ed. 533; see also United States v. Schneiderman, D.C.S.D.Cal.1952, 104 F. Supp. 405, 409.

The request for the production of copies of documents which the government intends to use at the trial is evidentiary and outside the scope of a bill of particulars. United States v. Pillsbury, supra. The government has offered full access to documents for inspection, copying or photographing in accordance with Rule 16 without the necessity of formal motion.

Several of the defendants ask, by way of bills of particulars, for the names of the witnesses who appeared before the Grand Jury. Proceedings of the Grand Jury are secret. Rule 6(e) of the Federal Rules of Criminal Procedure provides for disclosure of matters occurring before the Grand Jury upon a showing of good cause. Good cause has not been shown.

Accordingly, all motions of all defendants are denied.

The Court is advised that a petition for a writ of certiorari is now pending in the Supreme Court of the United States from the Ryan case, supra, decided by the Court of Appeals for the Second Circuit in July of this year. In view of this, and in the light of the fact that the conclusion reached herein on the principal issue is in direct conflict with the opinion of a higher court, albeit

## 54

of a different judicial circuit, the Court has given consideration to staying prosecution of this case until the Supreme Court acts on that petition. Two of the defendants urge a continuance be granted. But I have concluded that such would serve no useful purpose.

■ If the Supreme Court denies the petition for a writ of certiorari, it would carry with it no affirmation, or inference of affirmation, of the correctness of the Ryan opinion. Griffin v. United States, 1949, 336 U.S. 704, 716, 69 S.Ct. 814, 93 L.Ed. 993. The Supreme Court has time and again emphasized this point in an attempt to negative an assumption to the contrary. Maryland v. Baltimore Radio Show, 1950, 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562; Agoston v. Com. of Pennsylvania, 1950, 340 U.S. 844, 71 S.Ct. 9, 95 L.Ed. 619. In the last cited case, Justice Frankfurter repeated an oft-quoted principal that the denial of a petition for a writ of certiorari " 'imports no expression of opinion upon the merits of the case.' "

■■ If the Supreme Court grants the petition for a writ of certiorari, such action would not thereby alter the opinion of the Court of Appeals. It would only decide, in the exercise of "sound judicial discretion" that the issue was "an important question of federal law which has not been, but should be, settled by the" Supreme Court. Rule 19, Revised Rules of the Supreme Court, 28 U.S.C.A. Hence, to stay the prosecution of this case pending the decision of the Supreme Court on the petition for a writ of certiorari would be a useless act because its decision thereon would not settle the issue here or guide this Court in further disposition of the matter..

■ To stay the prosecution until the Supreme Court decided the Ryan case on the merits (assuming it granted a petition), would obviously be an undue prolongation of the time of trial. The Court has roughly estimated, from an examination of some of the reported cases over the last 5-year period, that on the average, approximately one year transpires between the filing of a petition for a writ of certiorari and the final decision thereon by the Supreme Court. This indictment was filed on February 5, 1955. Hence, approximately 1½ years would probably elapse between indictment and trial if the matter awaited a decision of the Supreme Court. These defendants are entitled to their constitutional guarantee of a speedy trial. The government is entitled to the benefits of a reasonably dispatchful disposition of criminal cases which it originates. Here the prosecution urges an early trial notwithstanding the Ryan appeal. It maintains that to delay the trial will prejudice its case. It is fearful that the evidence will grow cold and that the memories of witnesses may slip. The Court agrees that unreasonable delay in the trial of a criminal case is destructive of justice for the defendants and the public alike. "Justice delayed is justice denied."

The case will be placed on the September term calendar for disposition in the regular course. It is so ordered.