Basil Christodoulou and Sophia Christodoulou v. Commissioner.
Christodoulou v. Commissioner
Docket No. 75359.
United States Tax Court
T.C. Memo 1962-4; 1962 Tax Ct. Memo LEXIS 303; 21 T.C.M. (CCH) 10; T.C.M. (RIA) 62004; January 12, 1962
S. Regen Ginsburg, Esq., Philadelphia Natl. Bank Bldg., Philadelphia, Pa., for the petitioners. Albert Squire, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the years 1951 and 1952 in the amounts of $5,167.94 and $21,216.90, respectively. Certain issues have been conceded by each of the parties, leaving for our decision the following: 1. Whether a partnership in which petitioners were partners in 1951 and 1952 properly deducted as ordinary and necessary business expenses amounts claimed to have been expended for *304 labor procurement. 2. Whether respondent properly disallowed deductions by the partnership in 1951 for wages in the amount of $1,753.65 and entertainment expense in the amount of $5,788.50, and for the year 1952, payroll expense in the amount of $300, trucking expense in the amount of $950, entertainment and solicitation expense in the amount of $10,531.89, and job operation expense in the amount of $10,686.94. 3. Whether petitioners are entitled to deductions claimed by them on their income tax return for each of the years 1951 and 1952 for estimated travel and meals expense of $260, and estimated entertainment expense of $245. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners are husband and wife, residents of Broomall, Pennsylvania. They filed joint Federal income tax returns for the years 1951 and 1952, the return for 1951 being filed with the district director of internal revenue for the first district of Pennsylvania, and that for the year 1952, with the district director of internal revenue at Philadelphia, Pennsylvania. Petitioner Basil Christodoulou, hereinafter referred to as Basil, was during both of the years here *305 involved a partner in John Creticos Company, hereinafter referred to as the partnership, and was entitled to share in the profits and losses of the partnership to the extent of 45 percent. Petitioner Sophia Christodoulou, hereinafter referred to as Sophia, in 1952 was a partner in the partnership, entitled to share in its profits and losses to the extent of 5 percent. Sophia was not a partner in 1951. The other partners in 1951 and 1952 were John Creticos, the senior partner, and Mary Creticos. John Creticos is Sophia's father and Basil's father-in-law. The partnership was engaged in the business of contract painting on the eastern seaboard, specializing in industrial painting of structural steel, bridges, refineries, and industrial buildings. Its office was located at 815 Locust Street, Philadelphia, Pennsylvania, and its Federal returns of income were filed on the basis of the calendar year and on the cash receipts and disbursements method of accounting. In 1951 John Creticos maintained the partnership books of accounts and other records, but early in 1952 he suffered a heart attack which prevented him from coming to the partnership office. For a short while Mary Creticos maintained *306 the accouting records, and beginning in March 1952 Sophia kept the company's books. Sophia had no experience or training in bookkeeping or accounting when she took over maintaining the partnership records. At first the only record she made of disbursements was in the partnership checkbook. She followed this system until about May of 1952 when a certified public accountant employed to assist her with the record keeping set up a set of books for the partnership. When the books were set up by the accountant in May of 1952, he used the notations in the checkbook as made by Sophia to allocate expenditures to various items. After May 1952, allocations to the various categories of expenses on the books were made from the company vouchers and the accountant checked such allocations at least once a month. Basil was the partnership's outside superintendent and only general field supervisor. His duties included preparing estimates of costs of work which were submitted to prospective customers, hiring the proper crews to perform the work after award of a contract, location of motels or hotels for lodging of the men doing the work when such accommodations were necessary, supplying trucks for *307 the various jobs, and contacting executives of the different companies with which the partnership did business regarding the work which was being done. Basil also had general control of all partnership disbursements. Most of the disbursements on behalf of the partnership were made in cash by Basil, and partnership checks were drawn to him either as advances for such disbursements or in reimbursement therefor. Basil either supplied money to or reimbursed foremen in the field for cash expenditures they made for lodging the crews, operation and repair of trucks, meals of workers where such were furnished, and incidental expenses on the job such as coffee or soft drinks. Basil kept written records of the expenses he incurred showing the dates, amounts, and general purposes of the payments. It was on the basis of such records that he accounted for partnership advances or received reimbursement from the partnership. In 1951 he was reimbursed for such expenditures by John Creticos who was then keeping the books and records of the company, and in 1952, he was reimbursed by Sophia. The amounts charged on the partnership books under truck expense were amounts which Basil repaid to foremen for *308 oil and gas and repairs for trucks. At the time he was reimbursed for such amounts Basil had receipts from the various foremen showing the payments to them. The amounts deducted under entertainment and soliciation were on the basis of statements made by Basil that he had expended the amounts for that purpose or for payments to a liquor store or tobacco store. Basil sometimes gave fishing trips for executives of the various companies with whom the partnership did business, sometimes took these executives to lunch, and sometimes gave presents to these men. He also sometimes took the executives of his customers to sporting events and sometimes gave them tickets to such events. Some of the executives whom he entertained were also his personal friends. Basil at Christmas and occasionally at other times gave presents of liquor or cigarettes to the employees of the partnership. The cost of such gifts was charged on the partnership books to entertainment and soliciation. The amount charged on the partnership books to travel consisted of reimbursement, claimed by Basil, for his own travel expenses and for those of partnership employees. It was necessary for employees to travel to job sites *309 outside of Philadelphia in which city many of the partnership employees lived. The partnership had jobs in various locations in progress at the same time and most of Basil's time was spent either in going on inspection trips to those jobs or to sites to make estimates to bid for jobs. He usually traveled by automobile. The amounts charged on the partnership books to job operations consisted of amounts paid for foremen's expense, superintendent's expense, which consisted primarily of small supply items for the jobs and coffee or soft drinks for the workmen and claimed labor procurement expense. The partnership operated both under contracts providing for a lump sum payment for the work to be done, and contracts providing for a "fixed fee" based on a percentage of the cost of the work [*] be done. Under the "fixed fee" contract, [*] partnership was required to keep and [*] to the customer, receipts, vouchers, and other written memoranda covering its expenses. Under some of its contracts with the Pennsylvania Railroad during the years here involved, the partnership received, upon periodic submission of expenses, a fee of 5 percent of the total cost of the work indicated on the *310 billing. With the final audit of the contract, if the cost thereof was within the cost estimate made, an additional 10 percent fee was paid. The partnership during the years here involved also had other types of contracts with the Pennsylvania Railroad and contracts with the Sun Oil Company and the Philadelphia and Baltimore divisions of General Electric Company, which provided for payments to the partnership based upon the cost of the work performed which required the submission by the partnership to these companies of invoices covering expenditures. In September 1952 Basis was notified by John Creticos that the latter intended to dissolve the partnership in 90 days. Thereafter and prior to December 15, 1952, Basil, Sophia, and an attorney they had consulted to represent them in the dissolution of the partnership removed certain file cabinets containing some partnership records from the partnership office at 815 Locust Street. On December 15, 1952, John Creticos placed a lock on the door of the partnership office and thereafter Basil and Sophia were prohibited access to the partnership office. In December 1952, Basil instituted suit against John Creticos and Mary Creticos to preserve *311 the assets of the partnership. A master was appointed who held hearings beginning May 15, 1953. Certain records of the partnership for the year 1952 were turned over to the master, such records including the books and cancelled checks and certain types of vouchers, but the vouchers covering Basil's expenditures during that year were not turned over to the master. Neither Basil nor Sophia had these vouchers at the time of the trial of this case and were unable to locate them in the possession of John Creticos or Mary Creticos. The vouchers which had been submitted by the partnership to the General Electric Company and the Sun Oil Company in 1951 and 1952 were unavailable at the time of the trial of this case, having been destroyed after 7 years in accordance with the policy of those companies. Some of the vouchers which had been submitted by the partnership to the Pennsylvania Railroad were unavailable at the time of the trial of this case having been destroyed after 5 years in accordance with that company's policy. Vouchers submitted to the Pennsylvania Railroad in connection with some of the "fixed fee" contracts performed for that company by the partnership were produced at the *312 trial. The vouchers for truck expenses were based on an hourly charge for use of trucks which was not necessarily the actual cost of operation of the truck. Some of the contracts between the partnership and the Pennsylvania Railroad, after reciting the fee to be paid to the partnership, carried a provision that in addition a lump sum of a stated amount would be paid to the partnership for procurement of labor. Among the vouchers submitted to the Pennsylvania Railroad that were produced at the hearing were statements on plain paper written in pencil bearing a date and signed by Basil purporting to be for money paid to business agents of local unions for labor procurement. Some of these statements named the local union and some showed the location of a particular job. Each of these vouchers showed a dollar amount, such amounts ranging from $200 to $500 and each of these vouchers showed that the amounts for labor procurement had been approved for payment by the Pennsylvania Railroad and the partnership had been paid such amounts by that company. The Pennsylvania Railroad auditors who approved these vouchers did not know to whom the partnership made such payments nor were they concerned *313 with the recipients of the payments, their only concern being to see that the amount of labor procurement payments allotted to the partnership on any particular contract did not exceed the amount provided therefor in such contract. Some of the statements signed by Basil with respect to labor procurement in 1952 were with respect to work being done between Darby and Marcus Hook, Pennsylvania. These statements do not identify any local union. The area between Darby and Marcus Hook, Pennsylvania, was under dispute for jurisdiction between the Philadelphia and Chester local painters' union. During 1952 some of the men employed by the partnership working on painting for the Sun Oil Company in Marcus Hook were members of the Chester local. Most of the painters employed by the partnership were members of the Philadelphia local. Respondent in his notice of deficiency for the year 1951 increased the partnership income and the proportionate share of Basil by disallowing as deductions the amounts of $1,753.65 as wages overstated, $4,575 which was claimed as a deduction for labor procurement expense, $4,060 claimed as entertainment expense, and $1,728.50 claimed as entertainment expense - *314 liquor bills. The amount of entertainment expense disallowed was represented by the following entries upon the partnership books: Entertainment by John Creticos
$1,200
Entertainment by Basil Christodoulou
1,200
Entertainment by John and Mary
Creticos and Basil and Sophia
Christodoulou
1,660
Total
$4,060 Respondent also disallowed deductions claimed by Basil and Sophia on their joint income tax return in 1951 in the amount of $260 for travel and meals and $245 for entertainment expenses. In the year 1952 respondent disallowed claimed deductions by the partnership in the amount of $55,621.24 represented by certain designated checks drawn primarily to cash, although in two instances the checks were drawn to Basil, in three instances to Triangle Liquor Store, and in one instance to Olympia Tobacco Company. Respondent has now conceded the deductibility of all the amounts disallowed except the following: $300.00 of gross payroll expense. [1]
$950.00 representing amounts allocated from three checks made to cash and charged to truck expense as of April 23, 1952, April 30, 1952, and May 14, 1952. These were the only items charged on the partnership's books to truck *315 expense prior to May 28, 1952. $10,531.89 which consisted of all of the amounts allocated from the checks made to cash, charged to entertainment and solicitation and the amounts of the checks to the Triangle Liquor Store and the Olympia Tobacco Company. $2,140.50 which represented parts of checks drawn to cash dated February 6, 1952, April 10, 1952, and April 30, 1952, and all of a check dated March 12, 1952. These items constituted the entire charge to travel on the partnership records prior to May 28, 1952. $10,686.94 of amounts charged to job operations on the partnership's books which consisted of $8,050 of amounts claimed for labor procurement and $2,636.94 not specifically identified as to the item for which spent. $1,500.00 charged to miscellaneous expenditures on the partnership's books which represented labor procurement items. *316 For the year 1952 respondent disallowed $260 claimed to be deductible by petitioners on their joint return for travel, meals, etc., and $245 claimed to be deductible as entertainment expense. Ultimate Findings Ten thousand four hundred dollars of the amount of $10,686.94 charged on the partnership's books to job operations, which has not been conceded as being deductible by respondent represents the amounts deducted by the partnership as labor procurement expense. The $950 charged to truck expense on the partnership's record for the period prior to May 28, 1952, was an ordinary and necessary expense of the partnership's business for operating and maintaining its trucks. The $2,140.50 charged by the partnership to travel for the portion of 1952 prior to May 28 was ordinary and necessary expenses for travel for Basil and the partnership's employees; $286.94 of the amount charged to job operations on the partnership's books and not conceded by respondent to be deductible was ordinary and necessary expenses of the partnership's job operations. Petitioners have not shown error on the part of respondent in the disallowance of $1,753.65 as wages overstated in the year 1951. Of the *317 $5,788.50 of entertainment expense including liquor bills disallowed by respondent in 1951, the amount of $4,000 has been shown by petitioners to be an ordinary and necessary business expense. Of the $10,531.89 charged by the partnership as entertainment and solicitation expense in the year 1952 and not conceded by respondent, $5,000 was an ordinary and necessary expense of the partnership. Petitioners have failed to show that the amounts of $4,575 for 1951 and $11,900 for 1952 deducted by the partnership as labor procurement expense represented an ordinary and necessary business expense of the partnership. Petitioners have failed to show that respondent erred in disallowing the deductions claimed by them on their joint return as travel and entertainment expense in the amounts of $260 and $245, respectively, in each of the years 1951 and 1952. Opinion The evidence as to the actual payment of the amounts claimed by the partnership to be deductible as labor procurement expense is very meager. [1] It consists of Basil's statement that he handed the amounts in cash to men whose names he never knew, sometimes such amounts being handed to these men in public places. Even his testimony *318 as to why he believed these men to be union officials or union representatives is very vague, consisting of the statement that they had previously been pointed out to him as such in the union halls but that he did not obtain their names. We are not impressed by the fact that a number of the so-called vouchers which consisted of statements written in pencil or plain paper and signed by Basil were allowed and paid by the Pennsylvania Railroad in view of the testimony of an auditor of the Pennsylvania Railroad that the only interest of the railroad auditor was to see that the amount allowed for labor procurement was not more than the contract provided for that expense, and that the railroad in its audit did not verify to whom the money was paid or the exact reason for its payment. The evidence is insufficient to support a finding that the total amount claimed as deductions for labor procurement was actually paid to individuals whom Basil believed to be officials of the various local unions. However, from the fact that an allowance for labor procurement was made in the contracts with the Pennsylvania Railroad and Basil's testimony, we believe that some such payments were made in each of *319 the years 1951 and 1952. This, however, does not establish the deductibility of the amounts, and the evidence is far from sufficient to support petitioner's contention that these payments were ordinary and necessary business expenses. If we accept Basil's explanation that he never did know the names of the individuals to whom the payments were made and as of the date of trial was unable from recollection in some instances even to identify which locals he believed the persons to whom the payments were made represented, this merely shows that he did not obtain sufficient information when making these payments and have sufficient recollection at the date of the trial to furnish a basis upon which the court could determine whether the payments were ordinary and necessary business expenses. Stanley Rosenstein, 32 T.C. 230, 235-237 (1959) and cases therein cited. *320 Respondent argues that petitioners have failed to establish that the payments, if made, did not frustrate a national policy, sharply defined in a Federal statute as set forth in section 302 of the Labor Management Relations Act, 1947, 29 U.S.C. sec. 186, [2] citing Tank Truck Rentals v. Commissioner, 356 U.S. 30, 33 (1958). *321 Petitioners contend that the Tank Truck Rentals case is distinguishable since it involved the deductibility of a fine whereas the amounts sought to be deducted in the instant case were not fines. The Supreme Court in the Tank Truck Rentals case stated in part: A finding of "necessity" cannot be made, however, if allowance of the deduction would frustrate sharply defined national or state policies proscribing particular types of conduct, evidenced by some governmental declaration thereof. citing Textile Mills Securities Corp. v. Commissioner, 314 U.S. 326 (1941) wherein the Supreme Court upheld the validity of an income tax regulation distinguishing between legitimate business expenses and those arising from contracts to which the law has given no sanction. Here, if we were to assume that the payments made were in violation of section 302 of the Labor Management Relations Act, 1947, supra, the allowance of such payments as a deduction would be as much a frustration of clearly defined national policy as to allow the deduction of fines imposed for some violation of law. It is difficult to see how a payment which, itself, would be in violation of a Federal law could *322 constitute a necessary expense of operation of a taxpayer's business. Cf. Hoover Motor Express Co. v. United States, 356 U.S. 38 (1958). Petitioners further argue that section 302 of the Labor Management Relations Act, 1947, supra, is not applicable in the instant case since it was designed to prohibit bribery or extortion by individual officials or leaders of labor unions citing United States v. Brennan, 134 F. Supp. 42 (D.C.Minn., 1955) and William Dunbar Co. v. Painters & Glaziers Dist. Coun., 129 F. Supp. 417 (C.A.D.C., 1955). Each of these cases makes it clear that the provisions of section 302 of the Labor Management Relations Act, 1947, supra, are designed to prohibit the evils of bribery and extortion. The Brennan case involved payment to certain officials of unions who were not the bargaining representatives of those unions and the Dunbar Co. case, payments by an employer to a union welfare fund under a written agreement governing the labor management relationships of that company. Certainly the evidence here is insufficient to make any finding that the actions of the partnership in making these payments were in violation of section *323 302 of the Labor Management Relations Act, 1947, supra, but it is likewise insufficient to make any finding that it was not in violation of this act. Apparently, from the Dunbar Co. case, the Act was intended to cover, among other things, payments directly to officials of any union of which any employees of an employer were members unless there existed a written contract providing for such payments to the welfare or pension fund of the union. There is in the record some evidence tending to show that Basil made payments to either the Chester or Philadelphia local of which some of his employees were members, and there is no evidence to show that he did not have some employees who were members of the other locals to which he claims to have made payments. There is no evidence that there existed any written contracts between the partnership and any one of these locals providing for payments by the partnership to the locals' welfare fund. There is nothing to indicate that the agreement of the Pennsylvania Railroad to make an allowance to the partnership for labor procurement expense can be considered as a substitute for the written agreement referred to in the statute for payments into *324 the union welfare fund. In the instant case the evidence is totally insufficient to establish that the payment of these amounts was an ordinary and necessary business expense. The case of Lilly v. Commissioner, 343 U.S. 90 (1952), relied on by petitioners, involved payments by an optical company to doctors referring clients to that company under agreements between the two. There was no State or Federal law prohibiting such an arrangement. The doctors to whom the payments were made were not only identified but they testified at the trial. In that case the evidence was clear that the payment of such amounts was a customary and long-established practice in the industry. The facts in that case were sufficient to show that at the time the expenditures were made they were not contrary to any existing law and the court specifically stated therein that it recognized the province of legislatures to translate progressive standards of professional conduct into law and we note that legislation has been passed in recent years in North Carolina and other states outlawing the practice here considered. * * * A resulting abolition of the practice will reflect itself in the tax returns *325 of the parties without the retroactive hardship complained of here. On the basis of all the evidence of record, we conclude that petitioners have failed to establish that the deductions claimed for labor procurement expense in 1951 and 1952 represented an ordinary and necessary business expense of the partnership. Our ultimate findings dispose of the remaining issues which are all factual. We find no evidence in the record to show that respondent's disallowance of the deduction for overstatement of labor for1u951 was in error. The record shows that although Basil was unable at the date of the trial to produce the precise records which would have shown in detail the expenditures because of their being lost or destroyed at the date of trial, that the amounts deducted in the first 5 months of 1952 for truck expense and travel expense were amounts expended in the ordinary operation of the partnership's business, and we have, therefore, held that petitioners have sustained the burden of showing that these amounts constitute ordinary and necessary business expense deductions. We believe that petitioners have established that all the amounts charged to job operation other than labor *326 procurement were properly deductible and, therefore, hold that $286.94 of the $2,636.94 of this item not conceded by respondent and not found by us to represent charges for labor procurement is a properly deductible expense. We have found the amount of $10,400 to be the amount of claimed deductions for labor procurement charged to job operations based on petitioner's estimate to which respondent agreed. The $300 item which was deducted as part of the gross payroll expense and not conceded by respondent is stated by each party to represent possibly $300 of the $343.52 mathematical difference between respondent's disallowance and the addition of the various items he now contests. In any event, independently, this item has not been shown by petitioners to be deductible. The only remaining item of the partnership's deductions in dispute is that for entertainment and solicitation. We believe the charges made to this account as disbursements to Basil were for moneys disbursed to him on the basis of his statement that it was for entertainment. However, it is incumbent upon Basil to show that the expenditure of these amounts was for entertainment which was an ordinary and necessary expense *327 of the partnership. It is clear from Basil's testimony of the type of entertainment that he did which consisted of fishing trips, lunches, and tickets for sports events for representatives of various customers of the partnership and presents, including Christmas presents, for these individuals and certain employees of the partnership that the amounts allotted in each of the years by respondent, $4,000.56 in 1951 and $3,693.08 in 1952, would not be adequate to cover the expenses Basil would incur. On the other hand, the testimony is not precise as to the exact persons entertained and the exact nature of the expenses, and it appears that some of the amounts would include lunches or sports events tickets for Basil, himself, and that some of the entertaining done by Basil was primarily of a personal or social nature. Furthermore, a portion of the entertainment expense in 1951 consisted of amounts disbursed to John Creticos and Mary Creticos and there is no evidence in the record to show the nature of the entertainment done by these members of the partnership. Considering the evidence as a whole we have made the best estimate we are able to make and have concluded that in addition to the *328 amounts allowed by respondent as deductible for entertainment and solicitation expense, the partnership is entitled to deductions in the amounts of $4,000 in 1951 and $5,000 in 1952 as entertainment and solicitation expense. Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). The evidence of any travel or entertainment uncompensated for by the partnership done by Basil or Sophia is so meager and inconclusive that it does not warrant a finding that any amount was expended therefor, and, therefore, we sustain respondent's disallowance of deductions of $260 for travel and $245 for entertainment in each of the years 1951 and 1952, claimed by them in their joint income tax returns. Decision will be entered under Rule 50. Footnotes
1. This, however, may be explained by the fact that when the total concessions made by respondent are subtracted from the total amount disallowed, there is $25,765.81 remaining in dispute, whereas the total of the individual items still contested by respondent adds to $26,109.33, and the $300 item may be part of the unexplained difference of $343.52.↩
1. Basil testified that he made the disbursements which he stated were for labor procurement to men whose names he did not know at the time he made the payments or at the time of the trial of this case. He testified that he believed the men to whom he made the payments were union officials of the various local unions. He testified that the men to whom he made payments had been pointed out to him as union officials when he had visited the offices of the local union. He testified that the payments were always made in cash and were in amounts varying from $50 to $500. Basil testified that sometimes he took the cash to the office of the local and sometimes he met men on a street corner or in front of a hotel or at a railroad station and handed them the money. He testified that he never obtained a receipt for the money and that neither he nor the partnership ever received a statement or bill or other request for such payments. Basil further testified that these payments were made because he was primarily using his own painters to do work in the jurisdiction of a local union to which they did not belong and which ordinarily would have furnished three-fourths of the workers on any particular project. Basil testified that the amount he gave to the union officials was determined in his discretion based on his long experience in the painting industry, and he intended it for the welfare funds of the particular local. He testified that because of the hazardous type of work done by the partnership, he felt that his experienced workers were the only ones capable of doing the work adequately and that painters who could be furnished by the particular local would not be satisfactory. Basil stated that he did not know the actual use that the men to whom he gave the money made of it. No other representative of the partnership was with Basil when he made the payments. Basil testified that he considered these expenditures to be required in order for the partnership to be allowed to use its own skilled employees to work in jurisdictions where they were not members of the local union. He further testified that payments of such amounts were a general practice in the industry in which the partnership was engaged and were necessary in order to insure the quality of work to be performed and the noninterruption of the work while being performed. He testified that the amount of labor procurement which he estimated from past experience and performance in the different locations was running in 1951 and 1952 on an average of 4 to 5 percent of the total cost of a particular job where such expenditure was required.↩
2. Sec. 186. Restrictions on payments to employee representatives; exceptions; penalties; jurisdiction; effective date; exception of certain trust funds. (a) It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce. (b) It shall be unlawful for any representative of any employees who are employed in an industry affecting commerce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value. (c) The provisions of this section shall not be applicable * * * (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): Provided, That * * * (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of the employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, * * *. (d) Any person who willfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both. * * *
(g) Compliance with the restrictions contained in subsection (c)(5)(B) of this section upon contributions to trust funds, otherwise lawful, shall not be applicable to contributions to such trust funds established by collective agreement prior to January 1, 1946, * * *↩